UNITED STATES *v.* THOMAS.

1. A collector or receiver of public money, under bond to keep it safely and pay it when required, is not bound to render the money at all events, but is excused if prevented from rendering it by the act of God or the public enemy, without any neglect or fault on his part.
2. Such collector or receiver is a bailee of the government, and by the common law is only bound to due diligence and only liable for negligence or dishonesty; but by the policy of the acts of Congress on the subject a more stringent accountability is exacted.
3. The measure of this enhanced accountability is particularly to be found in the official bond required of these officers, the condition of which requires the payment of the moneys that come to their hands as and when directed; the performance of which condition can only be excused by an overruling necessity.
4. The late rebellion being a public war, the forcible seizure by the rebel authorities of public moneys in the hands of loyal government agents, against their will and without their fault or negligence, was a sufficient discharge from their obligations in reference to said moneys.

ERROR to the Circuit Court for the Middle District of Tennessee.

The United States sued Thomas and others as the principal and sureties on the official bond of the said Thomas, as surveyor of the customs for the port of Nashville, Ten-

nessee, and depositary of public moneys at that place. The condition of the bond was in the usual form, that he should faithfully execute and discharge the duties of his office, according to law, and should well, truly, and faithfully keep safely, without loaning, using, depositing in banks, or exchanging for other funds than as allowed by act of Congress, all the public money collected by him or otherwise placed in his possession and custody, till the same should be ordered by the proper department, or officer, to be transferred or paid out; and when such orders for transfer or payment were received, should faithfully and promptly make the same as directed, and should perform all other duties as fiscal agent of the government which might be imposed by any act of Congress or regulation of the Treasury Department, &c. The breach alleged was, that certain public moneys were collected by Thomas in his official capacity, and were placed in his possession and custody, of which a balance of $4880 remained in his hands on the 27th of April, 1861, which he did not keep safely, but which he paid out to persons not entitled thereto, whereby it was wholly lost; and that although the said sum was ordered by the proper department and officer to be transferred and paid out, he failed and refused to transfer or pay it out, as so required. The defendants, besides performance, pleaded seizure of the moneys in question by the rebel authorities by the exercise of force, which Thomas was unable to resist, and against his will and consent, he being a loyal citizen, endeavoring faithfully to perform his duty. Upon the trial, evidence was adduced tending to support this plea, and the court charged the jury that if they believed from the evidence that, at the time the demand was made by the insurgents for the surrender by Thomas of the effects in his hands belonging to the government, there was an organized insurrection in the State of Tennessee, and in the city of Nashville, against the government of the United States, with a force sufficient to compel obedience to the orders and demands of the governor who led and controlled such insurrection, and that in this state of things the demand was made upon Thomas to sur-

render said effects; and if they further believed that Thomas was acting in good faith, and surrendered the effects in his hands only in the honest belief that he would be imprisoned and the effects seized by force, and had good reason to apprehend that and other violence to his person; and if they believed that the threatened force would be applied to compel the surrender, then the court was of opinion that the seizure and appropriation of the government effects in his hands would be by public enemies of the United States, and would relieve him from liability for the same, notwithstanding the condition of his bond; but if they believed that Thomas was one of the insurrectionists, or willingly co-operated with them in their lawless acts against the government, the jury might infer that he was willing that the effects in controversy should fall into the hands of the rebel authorities, and he would not be relieved from the obligations of his bond. To this ruling an exception was taken, and whether the ruling was correct in law was the point now before this court.

*Mr. G. H. Williams, Attorney-General, and Mr. C. H. Hill, Assistant Attorney-General, for the plaintiff in error:*

Performance of an express contract is not excused by reason of anything occurring after the contract was made, though unforeseen by the contracting party, and though beyond his control. This law was declared in England years ago, in the old case of *Paradine* v. *Jane.** It is emphatically thus reasserted there of late time in *Ford* v. *Cotesworth :*†

"We think it firmly established, both by decided cases and on principle, that where a party has either expressly or impliedly undertaken, without any qualification, to do anything, and does not do it, he must make compensation in damages, though the performance was rendered impracticable by some unforeseen cause over which he had no control."

The rule was equally enforced in this country in *Dermott* v. *Jones,*‡ and has been applied by this and other courts to

* Aleyn, 26.    † 4 Law Reports, Q. B. 134.    ‡ 2 Wallace, 1.

the cases of official bonds under circumstances undistinguishable in principle from the present, in *United States* v. *Prescott*,* *United States* v. *Dashiel*,† *United States* v. *Keehler*,‡ *Boyden* v. *United States*,§ *United States* v. *Bevans*,‖ *Muzzy* v. *Shattuck*,¶ *Commonwealth* v. *Comly*,** and *State* v. *Harper*.††

In *Boyden* v. *United States*, the court observes:

"It is true that in Prescott's case the defence set up was that the money had been stolen, while the defence set up here is robbery. But that can make no difference, unless it be held that the receiver is a mere bailee. If, as we have seen, his liability is to be measured by his bond, and that binds him to pay the money, *then the cause which renders it impossible for him to pay is of no importance,* for he has assumed the risk of it."

*Mr. Henry Cooper, contra:*

We concede that it is no defence to an action on the official bond of a receiver of public moneys, conditioned to keep safely the public moneys, that the money was feloniously stolen, as in the cases of *United States* v. *Prescott,* or of *United States* v. *Dashiell,* or paid over by the officer voluntarily to a creditor of the government, without authority from the United States, but under a statute of the Confederate States, as was the case in the case of the *United States* v. *Keehler,* or where the officer is overpowered and robbed, as in the case of *United States* v. *Boyden,* or where an officer is in default, and such default concurs with the acts of a public enemy, and contributes to or facilitates the wrong, or renders it possible, by which the money is lost, as was the case of *United States* v. *Bevans.*‡‡ The principles settled in these cases have no application to the present case. In none of them does it appear that it was impossible to have prevented the loss. And to have excused the officers, under the circumstances, might have opened the door to fraud. But here we have this case: The officer was a loyal citizen

---

* 3 Howard, 578.          † 4 Wallace, 185.          ‡ 9 Id. 83–88.

§ 13 Wallace, 17.          ‖ Ib. 56.          ¶ 1 Denio, 233.

** 3 Barr, 372.          †† 6 Ohio State, 607.          ‡‡ 13 Wallace, 56.

of the United States, with her property in Tennessee, and Tennessee and the United States were public enemies, waging war. The public property of the latter is found within the territory of the former; the commanding general has the right to determine whether or not he will seize it; it is subject to seizure, and he orders Thomas to surrender it; the latter finds himself without protection, and is bound to submit to such laws as the ruler of the territory chooses to impose. If he had been ordered by the United States to transfer the effects to the loyal States he could not possibly have obeyed the order, nor could the United States have enforced it. Those who here gave the order were at the head of a government of paramount force. In such a case it is not only a necessity, but the duty of parties who reside in such territory to yield obedience to the ruling power in all civil and local matters.*

It was not necessary that actual violence should have been used to constitute duress. Moral compulsion was sufficient.†

Mr. Justice BRADLEY delivered the opinion of the court.

This case brings up squarely the question whether the forcible seizure, by the rebel authorities, of public moneys in the hands of loyal government agents, against their will, and without their fault or negligence, is, or is not, a sufficient discharge from the obligations of their official bonds. This precise question has not as yet been decided by this court. As the rebellion has been held to have been a public war, the question may be stated in a more general form, as follows: Is the act of a public enemy in forcibly seizing or destroying property of the government in the hands of a public officer, against his will, and without his fault, a discharge of his obligation to keep such property safely, and of his official bond, given to secure the faithful performance of that duty, and to have the property forthcoming when required?

---

* Thorington *v.* Smith, 8 Wallace, 11.

† Brown *v.* Pierce, 7 Wallace, 214; Baker *v.* Morton, 12 Id. 156.

The question is thus stated in its double aspect, namely: first, in regard to the obligation arising from official duty; and, secondly, in regard to that arising from the bond, because the condition of the latter is twofold,—that the principal shall faithfully discharge his official duties, and that he shall pay the moneys of the government that may come into his hands as and when it shall be demanded of him. It is contended that the latter branch of the condition has a more stringent effect than the former, and creates an obligation to pay, at all events, all public money received.

That overruling force arising from inevitable necessity, or the act of a public enemy, is a sufficient answer for the loss of public property when the question is considered in reference to an officer's obligation arising merely from his appointment, and aside from such a bond as exists in this case, seems almost self-evident. If it is not, then every military commander who ever lost a battle, or was obliged to surrender his ship or fort, or other public property, added a civil obligation to his military misfortune. And as it regards this question, it is difficult to perceive any distinction between the loss of one kind of property and another. If the property belongs to the government, the loss falls on the government; if it belongs to individuals, it falls on them.

The general rule of official obligation, as imposed by law, is that the officer shall perform the duties of his office honestly, faithfully, and to the best of his ability. This is the substance of all official oaths. In ordinary cases, to expect more than this would deter upright and responsible men from taking office. This is substantially the rule by which the common law measures the responsibility of those whose official duties require them to have the custody of property, public or private. If in any case a more stringent obligation is desirable, it must be prescribed by statute or exacted by express stipulation.

The ordinary rule will be found illustrated by a number of analogous cases.

It is laid down by Justice Story that officers of courts having the custody of property of suitors are bailees, and

liable only for the exercise of good faith and reasonable diligence, and not responsible for loss occurring without their fault or negligence.* Trustees are only bound to ex--ercise the same care and solicitude with regard to the trust property which they would exercise with regard to their own. Equity will not exact more of them.† They are not liable for a loss by theft without their fault.‡ But this exemption ceases when they mix the trust-money with their own, whereby it loses its identity, and they become mere debtors.§ Receivers, appointed by the court, though held to a stricter accountability than trustees, on account of their compensation, are nevertheless not liable for a loss without their fault; and they are entitled to manage the property and transact the business in their hands in the usual and accustomed way.‖ A marshal appointed by a court of admiralty to take care of a ship and cargo is responsible only for a prudent and honest execution of his commission.¶ "Every man," says Sir William Scott, "who undertakes a commission incurs all the responsibility that belongs to a prudent and honest execution of that commission. Then the question comes, What is a prudent and honest execution of that commission? The fair performance of the duties that belong to it. . . . He must provide a competent number of persons to guard the property; having so done he has discharged his responsibility, unless he can be affected with fraud, or negligence amounting in legal understanding to fraud."** A postmaster is bound to exercise due diligence, and nothing more, in the care of matter deposited in the post-office. He is not liable for a loss happening without his fault or negligence. Soon after the

---

* Story on Bailments, § 620.     † Ib.; Lewin on Trusts, 332, 3d ed.     ‡ Ib.
§ Ib. and 2 Story's Equity Jurisprudence, § 1270, and see §§ 1268, 1269; also 2 Spence's Equity Jurisprudence, 917, 921, 933, 937; Wren *v.* Kirton, 11 Vesey, 381; Utica Insurance Co. *v.* Lynch, 11 Paige, 520.

‖ Knight *v.* Ld. Plymouth, 3 Atkyns, 480; Rowth *v.* Howell, 3 Vesey, 566; Lewin on Trusts, 332, 3d ed.; Edwards on Receivers, 573–599; White *v.* Baugh, 3 Clark & Finnelly, 44.

¶ The Rendsberg, 6 Robinson, 142.

** 6 Robinson, 154; see also Burke *v.* Trevitt, 1 Mason, 96, 100.

organization of the government post it was attempted to charge the Postmaster-General to the same extent as the common carriers who had previously carried the mails; and the question was elaborately argued in the great case of *Lane* v. *Cotton et al.,** and Lord Chief Justice Holt strenuously contended for that view; but it was decided that the postmaster was only liable for his own negligence; and this case was followed by Lord Mansfield and the whole court, three-quarters of a century later, in the case of *Whitfield* v. *Le Despencer.*†

In certain cases, it is true, a more stringent accountability is exacted; as in the case of a sheriff, in reference to prisoners held by him in custody, where the law puts the whole power of the county at his disposal, and makes him liable for an escape in all cases, *except* where it is caused by an act of God or the public enemy.‡ The exception which thus qualifies the severest exaction of official responsibility known at the common law is worthy of particular notice. The reason for applying so severe a rule in cases of escape is probably founded in motives of public safety. Chief Justice Gibson, in *Wheeler* v. *Hambright,*§ says: "The strictness of the law in this respect arises from public policy." Lord Chief Justice Holt, in his dissenting opinion in *Lane* v. *Cotton,* also held that the sheriff was responsible in the same strict manner for goods seized in execution; but he cited no authority for the opinion, and the general rule of responsibility is certainly much short of that.

The basis of the common-law rule is founded on the doctrine of bailment. A public officer having property in his custody in his official capacity is a bailee; and the rules which grow out of that relation are held to govern the case. But the legislature can undoubtedly, at its pleasure, change

---

* 1 Lord Raymond, 646.

† Cowper, 754; see Story on Bailments, ? 463; Dunlop v. Munroe, 7 Cranch, 242.

‡ 33 Hen. VI; p. 1; Brooke's Abridgment, *tit.* Dette, 22; Dalton's Sheriff, 485; Watson on Sheriffs, 140.

? 9 Sergeant & Rawle, 396.

the common-law rule of responsibility. And with regard to the public moneys, as they often accumulate in large sums in the hands of collectors, receivers, and depositaries, and as they are susceptible of being embezzled and privately used without detection, and are often difficult of identification, legislation is frequently adopted for the purpose of holding such officers to a very strict accountability. And in some cases they are spoken of as though they were absolute debtors for, and not simply custodians of, the money in their hands. In New York, in the case of *Muzzy* v. *Shattuck*,* the court, after a careful examination of the statutory provisions respecting the duties and liabilities of a town collector, came to the conclusion (contrary to its previous decision in *The Supervisors* v. *Dorr*),† that he was liable as a *debtor*, and not merely as a *bailee*, for the moneys collected by him, and consequently that he could not excuse himself, in an action on his bond, by showing that, without his fault, the money had been stolen from his office.

Where, however, a statute merely prescribes the duties of the officer, as that he shall safely keep money or property received or collected, and shall pay it over when called upon to do so by the proper authority, it cannot, without more, be regarded as enlarging or in any way affecting the degree of his responsibility. The mere prescription of duties has nothing to do with the question as to what shall constitute the rule of responsibility in the discharge of those duties, or a legal excuse for the non-performance of them, or a discharge from their obligation. The common law, which is common reason, prescribes that; and statutes, in subordination to their terms, are to be construed agreeably to the rules of the common law.‡

The acts of Congress with respect to the duties of collectors, receivers, and depositaries of public moneys, it must be conceded, manifest great anxiety for the due and faithful discharge by these officers of their responsible duties, and

---

* 1 Denio, 233.          † 25 Wendell, 440.
‡ Bacon's Abridgment, *tit.* Statute, I, 4.

for the safety and payment of the moneys which may come to their hands. They are expressly required to keep safely, without loaning, using, depositing in banks, or exchanging for other funds than as specially allowed by law, all the public money collected by them, or in their possession or custody, till ordered by the proper department or officer to be transferred or paid out; and where such orders for transfer or payment are received faithfully and promptly to make the same as directed.* To obviate all excuse for casual losses, it is provided that they shall be allowed, under the direction of the Secretary of the Treasury, all necessary additional expenses for clerks, fire-proof chests or vaults, or other necessary expenses of safekeeping, transferring, and disbursing said moneys.† And it is expressly made embezzlement and a felony, for an officer charged with the safekeeping, transfer, and disbursement of the public moneys, to convert them to his own use, or to use them in any way whatever, or to loan them, deposit them in bank, or to exchange them for other funds except as ordered by the proper department or officer.‡ Every receiver of public money is required to render his accounts quarter-yearly to the proper accounting officers of the treasury, with the vouchers necessary to the prompt settlement thereof, within three months after the expiration of each quarter, subject, however, to the control of the proper department.§ Besides this, all such officers are required to give bonds with sufficient sureties for the due discharge of all these duties.‖ And upon making default and being sued, prompt judgment is directed to be given, and no claim for a credit is to be allowed unless it has been first presented to the accounting officers of the treasury for examination and disallowed, or unless it be shown that the vouchers could not be procured for that purpose, by reason of absence from the country, or some unavoidable accident.¶

These provisions show that it is the manifest policy of the

---

* 9 Stat. at Large, 61, § 9.  † Ib. 62, § 13.
‡ Ib. 63, § 16.  § 3 Id. 723, § 2.
‖ 1 Id. 705; 2 Id. 75; 9 Id. 60, 61, &c.  ¶ 1 Id. 514, §§ 3, 4.

law to hold all collectors, receivers, and depositaries of the public money to a very strict accountability. The legislative anxiety on the subject culminates in requiring them to enter into bond with sufficient sureties for the performance of their duties, and in imposing criminal sanctions for the unauthorized use of the moneys. Whatever duty can be inferred from this course of legislation is justly exacted from the officers. No ordinary excuse can be allowed for the non-production of the money committed to their hands. Still they are nothing but bailees. To call them anything else, when they are expressly forbidden to touch or use the public money except as directed, would be an abuse of terms. But they are special bailees, subject to special obligations. It is evident that the ordinary law of bailment cannot be invoked to determine the degree of their responsibility. This is placed on a new basis. To the extent of the amount of their official bonds, it is fixed by special contract; and the policy of the law as to their general responsibility for amounts not covered by such bonds may be fairly presumed to be the same. In the leading case of *The United States* v. *Prescott** (which was an action on a similar bond to that now under consideration), the court say: "This is not a case of bailment, and consequently the law of bailment does not apply to it. The liability of the defendant, Prescott, arises out of his official bond, and the principles which are founded on public policy." After reciting the condition of the bond, the court adds, with a greater degree of generality, we think, than the case before it required, "The obligation to keep safely the public money is absolute, without any condition, express or implied; and nothing but the payment of it, when required, can discharge the bond."

This broad language would seem to indicate an opinion that the bond made the receiver and his sureties liable at all events, as now contended for by the government. But that case was one in which the defence set up was that the money was stolen, and a much more limited responsibility than

---

* 3 Howard, 587.

that indicated by the above language would have sufficed to render that defence nugatory. And as the money in the hands of a receiver is not his; as he is only custodian of it; it would seem to be going very far to say, that his engagement to have it forthcoming was so absolute, as to be qualified by no condition whatever, not even a condition implied in law. Suppose an earthquake should swallow up the building and safe containing the money, is there no condition implied in the law by which to exonerate the receiver from responsibility?

We do not question the doctrine so strongly urged by the counsel for the government, that performance of an express contract is not excused by reason of anything occurring after the contract was made, though unforeseen by the contracting party, and though beyond his control—with the qualification, however, that the thing to be done does not become physically impossible; as, to cultivate an island which has sunk in the sea. It was thus decided in the leading case of *Paradine v. Jane.** The law on this subject is well stated by Sergeant Williams,† where he says: "When the law creates a duty, and the party is disabled to perform it without any default of him, and he has no remedy over, the law will excuse him; as in waste, if a house be destroyed by tempest, or by enemies, the lessee is excused; so, in escape, if a prison be destroyed by tempest or enemies, the gaoler is excused. But where the party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract."

It is contended that the bond, in this case, has the effect of such a special contract, and several cases of actions on official bonds have been cited to support the proposition. Those principally relied on are the cases of *United States v. Prescott,* just cited; *Muzzy v. Shattuck,‡ Commonwealth v. Comly,§ The State v. Harper,‖* and the recent cases of

---

* Aleyn, 26; Metcalf on Contracts, 212.   † 2 Saunders, 422 (a) note.
‡ 1 Denio, 233.       § 3 Barr, 372.       ‖ 6 Ohio State, 607.

Dashiel, Keehler, and Boyden in this court. It must be conceded that the language used by the court, not only in the case already referred to, but in some of the other cases cited, seems to favor the rule contended for. But in none of them was the defence of overruling necessity interposed. They were all cases of alleged theft, or robbery, or some other cause of loss, which would have been insufficient to exonerate a common carrier from liability. They all concur in establishing one point, however, of much importance, that a bond with an unqualified condition to account for and pay over public moneys enlarges the implied obligation of the receiving officer, and deprives him of defences which are available to an ordinary bailee; but they do not go the length of deciding that he thereby becomes liable at all events; although expressions looking in that direction, but not called for by the judgment, may have been used.

The case of *United States* v. *Prescott* has already been sufficiently adverted to. The next, in order of time, was that of *Muzzy* v. *Shattuck*, which was decided the same year, 1845, and in which the Supreme Court of New York construed the statutes of that State as making the town collector a *debtor* for the amount of taxes to be collected by him, and held him liable on his bond notwithstanding the money was stolen. Here again the result arrived at was correct; but the reasoning by which it was attained may be fairly questioned. The statutes of the State, however, may have justified the view which was taken in that case.

The next case is that of *The Commonwealth* v. *Comly*, decided in 1846. That was an action on the bond of a collector of tolls, and the same defence (of theft) was interposed. Chief Justice Gibson refers to the case of *United States* v. *Prescott*, and remarks, that "the responsibility of a public receiver is determined not by the law of bailment, which is called in to supply the place of a special agreement where there is none, but by the condition of his bond." So in the case of *The State* v. *Harper et al.*, which was an action on the official bond of a county treasurer, conditioned for the payment of all moneys that should come to his hands for State,

county, or township purposes; and larceny of the money being pleaded, the court say: "By accepting the office, the treasurer assumes upon himself the duty of receiving and safely keeping the public money, and of paying it out according to law. His bond is a contract that he will not fail, upon any account, to do these acts;" and the defence of larceny was overruled.

It is unnecessary to examine the cases further in detail. It appears from them all (except perhaps the New York case) that the official bond is regarded as laying the foundation of a more stringent responsibility upon collectors and receivers of public moneys. It is referred to as a special contract, by which they assume additional obligations with regard to the safe-keeping and payment of those moneys, and as an indication of the policy of the law with regard to the nature of their responsibility. But, as before remarked, the decisions themselves do not go the length of making them liable in cases of overruling necessity. On the contrary, in the last reported case on the subject, that of *Bevans* v. *United States*,[*] Mr. Justice Strong, delivering the opinion of this court, says: "It may be a grave question whether the forcible taking of money belonging to the United States, from the possession of one of her officers or agents lawfully holding it, by a government of paramount force, which at the time was usurping the authority of the rightful government, and compelling obedience to itself exclusively throughout a State, would not work a discharge of such officers or agents, if they were entirely free from fault, though they had given bond to pay the money to the United States." These observations show that the particular question raised in this case has been reserved by the court after its most mature consideration of the subject.

So much stress has, in almost every case, been laid upon the bond as forming, either directly or indirectly, the basis of a new rule of responsibility, that it seems especially important to ascertain what are the legal obligations that spring

---

[*] 13 Wallace, 56.

from such an instrument. The learned judges in the great generality of the remarks made in some of the cases referred to, with regard to the liability of a receiving officer, and especially of his sureties, by virtue of his bond, have evidently overlooked what we conceive to be a very important and vital distinction between an absolute agreement to do a thing and a condition to do the same thing, inserted in a bond. In the latter case the obligor, in order to avoid the forfeiture of his obligation, is not bound at all events to perform the condition, but is excused from its performance when prevented by the law or by an overruling necessity. And this distinction, we think, affords a solution to the question involved in this case.

The following extract from Coke on Littleton expresses the law on this subject, which is repeated by Blackstone and other modern authorities: "In all cases," says Lord Coke, "where a condition of a bond, recognizance, &c., is possible at the time of making of the condition, and before the same can be performed, the condition becomes impossible by the act of God, or of the law, or of the obligee, &c., there the obligation, &c., is saved. But if the condition of a bond, &c., be impossible at the time of the making of the condition, the obligation, &c., is single."*

Of course the above rule does not apply to a money bond given for a debt, where the condition is simply for the payment of a less sum of money than the penalty; for there, as the books say, the condition is of the same nature as the obligation itself, and not collateral to it.† The bond in suit is not such a money bond. The condition of an official bond is collateral to the obligation or penalty; it is not based on a prior debt, nor is it evidence of a debt; and the duty secured thereby does not become a debt until default be made on the part of the principal. Until then, as we have

---

* Co. Litt., 206 (a); 2 Thomas's Co. Lit. 22; Shepherd's Touchstone, 372; 2 Blackstone's Commentary, 340, 341; Bacon's Abridgment, *tit.* Condition (N), (Q); Comyn's Digest, *tit.* Condition, D, 1.

† 1 Rolle's Abridgment, 448; Viner's Abridgment, "Condition," (D, e); Panel *v.* Nevel, Dyer, 150 (a).

seen, he is a bailee, though a bailee resting under special obligations. The condition of his bond is, not to pay a debt, but to perform a duty about and respecting certain specific property which is not his, and which he cannot use for his own purposes. In the case of *Farrar and Brown* v. *United States*,* the question being whether sureties were liable for defaults made prior to the giving of the bond, the court say: "For any sums paid to Rector (the principal) prior to the execution of the bond, there is but one ground on which the sureties could be held answerable to the United States, and that is the assumption that he still held the money in bank or otherwise. If still in his hands, he was up to that time *bailee of the government;* but on the contrary hypothesis he had become a *debtor or defaulter* to the government, and his offence was already consummated." That is, as custodian of the money he is bailee of the government—not a debtor. What makes him a debtor or defaulter is the very question at issue. When he becomes such, then he and his sureties are liable until the amount is paid, as we held in the late case of Bevans, before referred to. Until then, neither he nor they are liable on the bond.

We think that the case is within the law as laid down by Lord Coke, and that the receiver, and especially his sureties, are entitled to the benefit of it; and that no rule of public policy requires an officer to account for moneys which have been destroyed by an overruling necessity, or taken from him by a public enemy, without any fault or neglect on his part.

JUDGMENT AFFIRMED.

Justices SWAYNE, MILLER, and STRONG dissented; Justice MILLER for himself saying as follows:

The case of *United States* v. *Prescott*† arose on a certificate of division of opinion of the Circuit judges, on the question whether "the felonious taking and carrying away the public moneys in the custody of a receiver of public moneys, with-

---

* 5 Peters, 373.                    † 3 Howard, 578.

out any fault or negligence on his part, discharged him and his sureties, and may be set up as a defence to an action on his official bond."

This question the court, without dissent, answered in the negative. The ruling was based, in the opinion of the court, on two grounds, clearly stated:

1. That the receiver, or other depositary of public funds in such cases, could not avail himself of the ordinary circumstances which would discharge a bailee for hire, by reason of an imperative principle of public policy. This policy was founded in the danger of collusive defences which the depositary could easily manage so as to make a strong case, and which the government could have no means of rebutting, however false or simulated it might be. And it was thought better to hold the party to the absolute payment or delivery of the money, than to open the door to such frauds.

2. That the depositary and his sureties, having given a bond, the condition of which was an express contract to pay or deliver, they were bound by that contract, according to the rigid terms which the law annexes to such covenants or promises.

In the subsequent case of *United States* v. *Morgan*,* the same question is decided on precisely the same grounds.

The case of *United States* v. *Dashiel*† was decided with merely a reference to the doctrine of the two cases just cited.

The case of *United States* v. *Keehler*‡ asserts the same doctrine and applies it to an action on a postmaster's bond, who had paid the money to an agent of the Confederate States on an order made by the insurrectionary government directing him to do so.

When the case of *United States* v. *Dashiel* came before the court I was not satisfied with the doctrine of the former cases. I do not believe now that on sound principle the bond should be construed to extend the obligation of the depositary beyond what the law imposes upon him, though

---

* 11 Howard, 154.         † 4 Wallace, 182.         ‡ 9 Id. 83.

it may contain words of express promise to pay over the money. I think the true construction of such a promise is to pay when the law would require it of the receiver, if no bond had been given; the object of taking the bond being to obtain sureties for the performance of that obligation. Nor do I believe that prior to these decisions there was any principle of public policy recognized by the courts, or imposed by the law, which made a depositary of the public money liable for it, when it had been lost or destroyed without any fault of negligence or fraud on his part, and when he had faithfully discharged his duty in regard to its custody and safe-keeping. Such were my opinions when, as a member of the court, I took part in the decision of *United States* v. *Dashiel.* But either no other judge shared those opinions, or, if any one did, he felt bound by the two previous decisions. I therefore acquiesced.

I understand the opinion in the present case to be directed to two points: 1. Mainly to undermining the ground on which the prior decisions on this subject rest. And, 2d. To establishing a distinction between this case and those.

As regards the first point. If the opinion or judgment of the court were based upon a frank overruling of those cases, and an abandonment of the doctrines on which they rest, I should acquiesce in that, though I did not in conference approve the judgment. But if the opinion of the court is to be construed as permitting those cases to stand as law while the principles on which alone they can be defended are weakened by its argument, I must express my dissent from that view of the case. And still more strongly do I dissent from the distinction attempted to be drawn between this case and those. If a theft or a robbery in time of profound peace can be so easily simulated, and the collusion can be so successful, that public policy requires that no such defence be listened to, I leave it to any ordinary understanding to say how much more easily the pretence of force by the rebels can be arranged and proved by consenting parties, and how much more difficult for the government to disprove such collusive arrangements than in the other case mentioned.

The Congress of the United States, recognizing the law as laid down in the former decisions of this court, provided by the act of March 3, 1865, for such cases of hardship as it thought worthy of relief. Unless, therefore, the doctrine be reviewed and placed on such basis of sound principle as would do justice in all cases, I see no reason to make exceptions in favor of persons who, like the present defendant, holding by virtue of his office the money of the United States, delivered it into the hands of its enemies, without the application of the slightest personal violence, or a moment's imprisonment, or any attempt to seize his person or property, on the ground that they were able to do these things and threatened to do them. Such excuse, easily made, easily proved, hard to be confuted, is, in my judgment, much weaker than that of theft admitted to be without fault or fraud on the part of the depositary.