IN THE

# SUPREME COURT OF SOUTH CAROLINA.

Justices of the Supreme Court during the Period comprised in this Volume.

HON. W. D. SIMPSON, CHIEF JUSTICE.
HON. HENRY McIVER, ASSOCIATE JUSTICE.
HON. SAMUEL McGOWAN, "        "

CASE No. 1005.

### YORK COUNTY v. WATSON.

1. There being in this state no statute which imposes upon a county treasurer a higher obligation than that imposed by common law, such officer is not liable for the loss of county funds, occasioned by the failure of a savings bank, which was in good standing at the time the moneys were placed there on deposit.
2. The auditor's duplicate may be used as one of the means by which to ascertain the indebtedness of a county treasurer.
3. Findings of fact, concurred in by referee and Circuit judge, sustained, there being no clear preponderance of testimony to the contrary.

Before WALLACE, J., York, November, 1879.

A

Action commenced January 26th, 1878, by York county against a former treasurer of that county, John L. Watson, for an accounting of county funds which had passed through his hands. The issues as presented to this court, by the appeal, involved the defendant's liability for a loss occasioned by the failure of a bank, and also the matter of an alleged overcharge against the treasurer.

The case was first argued in this court May 28th, 1880, and being ordered for re-argument, was again heard January 18th, 1881.

Defendant became county treasurer of York county, in March, 1871. Between that date and November, 1873, he made deposits of public moneys in the Yorkville branch of the Citizens' Savings Bank, the parent bank being in Columbia. These deposits were interest-bearing deposits. In November, 1873, defendant had to his credit in the branch bank $4683.33. He went to the parent bank on some day in November and presented his check for about $4000 (the brief nowhere gives the exact amount), which the bank did not pay, alleging as a reason want of knowledge as to his bank account in Yorkville. The next day Watson commenced proceedings against the bank in the state courts, and the bank then filed its petition in bankruptcy in the United States District Court. Watson received in all forty-seven and a half per cent. dividend on his deposits, for which he properly accounted. Interest upon his deposits was, at intervals, credited to him upon his bank account, but he at no time drew upon these interest credits, as such, nor drew any checks for amounts corresponding, although several checks were payable to and drawn by "self." Under the contract of interest deposits, the bank was entitled to notice of from fourteen to thirty days, according to amount of draft, which might be waived. It does not appear whether notice was exacted from Watson.

The issues of law and fact were referred to James Hemphill, Esq., to determine and report. He reported to the court the testimony taken before him and stated the accounts. His conclusions of fact were as follows:

"On the other question, as to the alleged corrupt and improper conduct of the defendant having caused the bankruptcy of the

bank, and thereby occasioned the loss of the county money, I do not see sufficient ground to sustain the charge. There were some circumstances detailed by the witnesses on the part of the plaintiff which were apparently suspicious, but which were denied or explained by the defendant and his witnesses. I hold that there is not sufficient proof to make the defendant responsible for the loss sustained by the failure of the savings bank.

" *Second.* I have given the defendant credit for     *     *   *  the sum of $971.80, which was allowed to the treasurer as an overcharge by the auditor and county commissioners, and which appears in the report of the county commissioners of November 1st, 1874;   *   *   *.   ——— allowed on the commissioners' report of 1874, upon the evidence of Col. W. B. Allison, formerly county commissioner and clerk of the board, and of the defendant.

" These two witnesses both swear positively that the accounts were carefully and thoroughly examined by the former county auditor, Mr. Enloe, who is now dead, and by Col. Allison, and that upon this investigation they ascertained that the defendant was justly entitled to this credit.   *   *   *   On the question of fact, I find—

" *Third.* That he was overcharged $971.80.

" On the item of commissions, I allowed the defendant four per cent. on all his collections."

· The case came up before Judge Wallace on exceptions to the referee's report. The Circuit judge sustained the findings of the referee as to " the item of $971.80, as an overcharge, the court being satisfied that this amount should be deducted from the aggregate of charges against the defendant, as they shall be compiled according to the directions in this order." He also held that defendant was " not liable for any loss of the funds of plaintiff (principal or interest) incurred by reason of the deposit of said funds in the Citizens' Savings Bank, the court being satisfied with the findings of the referee upon this point, both as matter of law and fact." The Circuit decree also contained the following findings :

" 5. It is further ordered and adjudged, that the defendant

should also be charged with the assessments for county purposes proper, as shown by the auditor's tax duplicate for the years 1872, 1873, 1874 and 1875, after giving proper credits for the *pro rata* of abatements for those years belonging to the county proper, the court being satisfied that the auditor's books are the proper sources from which to make such charges.

" 6. It is further ordered that it be referred to Winthrop Williams, Esq., as special referee, to take testimony and report the amount of principal and interest of the county funds proper which were in the bank at the time of the suspension, and, after charging defendant with the interest, to give him credit for fifty-two and a half per cent. of the original principal and interest as the uncollected portion thereof."

To this decree plaintiff excepted as follows, and appealed to this court:

1. For error in allowing defendant credit for the sum of $971.80, as an overcharge.

2. For error in holding " both as matter of law and fact," " that defendant is not liable for any loss of the funds of plaintiff (principal or interest) incurred by reason of the deposit of said funds in the Citizens' Savings Bank," and for ordering that the referee " after charging defendant with the interest," give him credit for fifty-two and a half per cent. of the original principal and interest as the uncollected portion thereof.

3. For error in holding, as matter of law, " that the auditor's books are the proper sources from which to " charge the defendant for the county taxes, " as shown by the auditor's tax duplicates for the years 1872, 1873, 1874 and 1875," thereby limiting plaintiff to those sources for making up such charges.

*Mr. James F. Hart,* for appellant.

The respondent being a receiver of public moneys, under bond for the faithful discharge of his duty as required by law, is absolutely liable for the loss of the funds in his custody, by whatsoever manner this loss occurs. This proposition rests on statute law and public policy. This principle has never been adjudicated in this state, but it has been acted upon. 15 *Stat.* 287, 465, 805, 819. It has been determined by tribunals of other states.

3 *How.* 588; 11 *How.* 154; 4 *Wall.* 182; 13 *Wall.* 17; 1 *Denio* 233; 3 *Penna. St.* 372; 33 *N. J.* 339; 6 *Ohio St.* 607; 1 *Woodb. & M.* 45; 30 *Ill.* 99; 22 *Ind.* 125; 12 *Cush.* 112; 39 *Iowa* 9; 32 *Mich.* 132. *United States* v. *Thomas*, 15 *Wall.* 337, does not, in its decision, conflict with these cases, although there are *dicta* which would seem to impair the force of the older cases. See *Gen. Stat., pp.* 83, 148, 213.

2. If the respondent deposited in bank the trust funds of the county in his custody in such a manner that he did not have immediate control over them, so as to be able to withdraw them on the first apprehension of danger, he is liable for their consequent loss. 2 *Russ. & Myl.* 215; *Perry on Trusts* 443; *Hill on Trust.* 540.

3. Having deposited the public funds in a savings bank, with a view of making interest thereon, he stands in the position of a bailee or trustee who has loaned the fund for profit, and is absolutely liable. 1 *Beav.* 525; 6 *Beav.* 239; 29 *Beav.* 213; *Hill on Trust.* 540; *Perry on Trusts*, §§ 429, 446. It was a *lending* of the funds without authority, and, therefore, at his own risk, and the consequent loss must fall on him. 32 *Mich.* 132; 2 *Wall.* 256; 5 *Denio* 555; 36 *Ind.* 346; 9 *Metc.* 499; 12 *Cush.* 112; 4 *Vroom* 339; 26 *N. Y.* 514.

*Mr. G. W. S. Hart,* on same side.

*Messrs. Witherspoon & Spencer,* contra.

March 21st, 1881. The opinion of the court was delivered by SIMPSON, C. J. This is an appeal in a case "in chancery," and it involves questions both of law and of fact.

The respondent was county treasurer for York county, from March, 1871, to March, 1877. It is alleged in the complaint that during the period he held this office he collected large sums of money for the appellant, a considerable portion of which he failed and neglected to account for and pay over to appellant.

This allegation seems to be true, but it appears that this default of respondent resulted from the fact that respondent had deposited this money in the Citizens' Savings Bank; that this

bank has failed, and the loss which has occurred was on account of this failure of the bank.

The appellant contends that, even admitting this to be true, yet, as matter of law, respondent should be regarded as an insurer, liable for the whole amount collected, and that the facts set up by him constituted no legal defence.

The Circuit judge declined to enforce this stringent principle, and, holding that respondent's liability was dependent upon negligence and the proper performance of his duties, he decreed, upon the facts, that the respondent was not liable for the loss incurred by reason of his deposit in the Citizens' Savings Bank.

The ground of appeal in this case, involving this point, brings up for the first time in this state squarely the question as to the absolute and unconditional liability of a public officer for public funds collected by him.

This is an interesting and very important question, both to the state and to all those connected with the fiscal department of the government, and it has been maturely considered by this court.

It is a well-settled principle of the common law that agents, trustees, receivers, and all those sustaining fiduciary relations to private individuals, and thereby having the custody and management of their property, such as administrators, executors, guardians and other trustees, are liable only for the exercise of good faith and proper legal diligence and care. True, the court will watch very narrowly the conduct of such trustees, and will never suffer them to escape responsibility out of mere tenderness to their misfortunes. But when it is made to appear that they have kept themselves within the rules prescribed for the discharge of their special duty, and yet a loss has occurred without any fault or negligence on their part, the court will protect them.

This principle is founded upon the highest justice and the soundest morality. It has its roots in the doctrine of *ex œquo et bono*, and it meets the approval of all just men. Where a party attends to his own business and a loss occurs, he cannot throw this loss on some one else, but he must meet and shoulder it himself. Where, then, he is under the necessity of procuring the assistance of another to attend to his affairs, because he is unable to do so himself, all that he can justly require from his agent is

good faith, competency and such diligence and care as to the matter in hand as he himself would have given it. This being bestowed, if a loss occurs it should be his loss and not that of the employee. Any other doctrine would cut up, root and branch, one of the most important departments of the business and social economy of the country—the department of bailments. This term, in its broadest sense, covers all classes of agencies. These ramify into and touch every interest of society, and unless properly regulated, society would go to pieces.

It is a matter of the gravest importance, therefore, that whilst the rights of bailors should be most carefully guarded and protected, yet that bailees should not be hastily sacrificed.

The principles referred to above are those which prevail between private parties, and, in reference to private affairs, as found in the common law. They have been applied in many cases in this state. It is only necessary here to refer to the recent case of *Twitty* v. *Houser*, 7 *S. C.* 164, where an administrator, depositing in this same bank, was protected.

Does this common law principle embrace public bonded officers as well as private individuals acting in a *quasi* official capacity as trustees, &c. ? It would be difficult to find a clear distinction between the two—a distinction founded upon principle, such as would justify the exclusion of the one and the inclusion of the other. If it would be wrong in principle to hold a private trustee responsible for a loss which no care of his could have prevented, would it not be equally wrong to hold a public officer responsible under like circumstances? The liability of a bonded officer may be considered, as was said in the case of United States *v.* Thomas, in a two-fold or double aspect. *First.* The obligation arising from official duty, and, *second*, that arising from the condition of his bond. The first is a duty which the law imposes, and the second is a duty which he expressly contracts to perform. The first is governed by the principles of the common law, the other by the terms and conditions of the bond; and if a party binds himself by an express contract to perform a certain act unconditionally, at all events, he must be held by the stipulations of that contract, because such is the agreement he has made.

Now, independent of the special stipulations and conditions found in the bond of a public officer, it has been held at common law that the principles referred to above, as applicable to private individuals, apply also to public officers, so far as their obligations arising simply from official duty are concerned.

It was said in the case of *United States* v. *Thomas*, 15 *Wall.* 344: "The basis of the common law rule is founded on the doctrine of bailment. A public officer having property in his custody, in his official capacity, is a bailee, and the rules which grow out of that relation are held to govern the case." And in Boyden *v.* United States, where the officer was held responsible, this doctrine was not denied. On the contrary, it is said in that case: "The contract of bailment implies no more, except in the case of common carriers, than ordinary care; and the duty of a receiver, *virtute officii*, is to bring to the discharge of his trust that prudence, caution and attention which careful men usually bring to the conduct of their own affairs. He may, however, make himself an insurer by express contract, and this he does when he binds himself in a penal bond to perform the duties without exception. There is an established difference between a duty created merely by law and one to which is added the obligation of an express undertaking." The defendant in that case was held liable under the terms of his bond.

Mr. Justice Bradley, in the case of United States *v.* Thomas, said: "The general rule of official obligation, as imposed by law, is that the officer shall perform the duties of his office honestly, faithfully and to the best of his ability. This is the substance of all official oaths. In ordinary cases, to expect more than this would deter upright and responsible men from taking office. This is substantially the rule by which the common law measures the responsibility of those whose official duties require them to have the custody of property, public or private. If in any case a more stringent obligation is desirable, it must be prescribed by statute or exacted by express stipulations." Accordingly, the congress of the United States and several of the states have made statutory regulations upon this subject, laying the foundation in the official bonds required for a more stringent responsibility than is

ordinarily imposed by the common law, especially as to collectors and receivers of public moneys.

It will be found that the cases relied on by the appellant, viz., *United States* v. *Prescott*, 3 *How.* 578 ; *Same* v. *Dashiel*, 4 *Wall.* 185 ; *Same* v. *Keehler*, 9 *Wall.* 83 ; *Boyden* v. *United States*, 13 *Wall.* 17 ; *Bevans* v. *United States, Id.* 56, decided in the Supreme Court of the United States, and the case of *Muzzy* v. *Shattuck*, 1 *Denio* 233, in New York, all turned upon the stipulations and conditions of the bonds ; it being held in those cases, in accordance with established principles and many decided cases, that where a party contracts without qualification or condition to do a thing, he must perform it or make compensation in damages for non-performance, because it is nominated in the bond. But even this stringent rule was much relaxed in the Supreme Court of the United States in the recent case of *United States* v. *Thomas*, 15 *Wall.* 337, where a collector was excused even from his bond on account of overruling necessity, where it appeared he was without neglect or fault. And this rule was relaxed, although under the acts of congress collectors are allowed all necessary additional expenses for clerks, fire-proof chests and vaults for the safe-keeping, transferring and disposing of the public moneys collected by them.

Now we have no act in this state which imposes a higher or more stringent obligation upon collectors and receivers of public money than that imposed by the common law. The form of the bond, it is true, is prescribed by statute, but the only condition is " that the duties shall be well and truly performed." This condition is the condition of the common law, arising from official duty, and is met at common law by an honest, faithful, prudent and zealous discharge of duty. Should it be thought that public policy required a more stringent rule, the general assembly, in its wisdom, could easily provide the necessary enactments to that end, but it has not done so as yet, and in the absence of such statutory regulations, the courts must follow the common law applicable to such cases. We think, in this case, the Circuit judge followed that law in declining to hold the respondent as an insurer.

We do not understand that the Circuit judge ruled as a matter

of law, that the auditor's duplicates were the only source from which to obtain the assessments by which to charge the respondents, but that he referred to these as one of the means by which this could be done, and we see no error in this.

The referee and the Circuit judge have both found, as a matter of fact, that the item of $971.80 was an overcharge, and should have been deducted from the aggregate against the respondent. They have also found, as matter of fact, that the evidence did not sustain the charges of corrupt and improper conduct alleged against the respondent as to the insolvency of the bank in which he had deposited the funds in question.

Where the referee and judge concur in conclusions of fact, it must be shown that the clear preponderance of the testimony is the other way to authorize this court to overthrow their findings. *Austin* v. *Kinsman,* 1 *S. C.* 111 ; *Blackwell* v. *Searles, Id.* 117. We do not find such clear preponderance in this case as to the facts involved in this appeal.

The decree below is affirmed and the appeal dismissed.

McIVER and McGOWAN, A. J.'s, concurred.