## Denny, Banking Commissioner v. Thompson.

(Decided December 19, 1930.)

J. W. CAMMACK, Attorney General, and M. B. HOLIFIELD, Assistant Attorney General, for appellants.

WHEELER & HUGHES for appellee.

716

OPINION OF THE COURT BY COMMISSIONER STANLEY—
Reversing in part on direct appeal, and affirming on
cross-appeal.

This appeal presents two major questions: (1) Is
the commonwealth and its political subdivisions to be
accorded a preference in the distribution of assets of an
insolvent bank? and (2) when is a deposit made after the
bank became insolvent to be returned to the depositor?
Disposition must also be made of some subsidiary issues.

The case arises from the placing of the Hickman
Bank & Trust Company in the hands of the banking com-
missioner for liquidation because of its insolvency on
December 30, 1929. The appellee and cross-appellant,
John M. Thompson, sheriff of Hickman county, had on
deposit to the credit of an account styled "John M.
Thompson, Tax Account," $18,522.27, representing tax
collections for the state, county, the school and levee dis-
tricts. By injunctive process he sought to have the bank-
ing commissioner and his representatives pay him that
sum, but it was held by this court that under the statute
the proper procedure to determine his right of prefer-
ence was by a petition for review of, or exceptions to, the
commissioner's report made in the circuit court, should
that officer disallow his claim. Thompson v. Denny,
Banking Commissioner, 233 Ky. 696, 26 S. W. (2d) 514,
515. The commissioner did deny the sheriff's right of
preference altogether, and he has pursued the method
indicated. The circuit court allowed his claim in part.
From that judgment the respective parties appeal.

1. The issue was raised as to whether the bank was
in fact insolvent, and that matter is also presented. By
a resolution of the board of directors, under circumstan-
ces to be related, the insolvency of the bank was declared
to exist "owing to the number of frozen loans and short-
age of cash;" and the bank was placed in the receiver-
ship of the banking commissioner for liquidation. On
the evidence heard, it is contended in behalf of the appel-
lant that the only cause for closing the bank was exces-
sive unliquid assets, and that in time these can be
reduced to money and the depositors paid in full; hence
that the right of preference need not be considered. On
the other hand, the appellee sought to show, and here
contends that he did show, that the assets considered
good but slow are in fact practically worthless. We do
not enter into a consideration of the difficult question, for
it is readily apparent—in fact admitted—that the bank

was not in condition to pay its debts and depositors in the usual and ordinary course of business. Such condition is construed as insolvency within the meaning of the law relating to the liquidation of banks. Commonwealth ex rel. Denny, Banking Commissioner v. Hargis Bank & Trust Co., 233 Ky. 801, 26 S. W. (2d) 1045.

2. Another preliminary issue to be disposed of is whether the deposit is the property of the state and taxing districts. The argument is made in behalf of the banking commissioner that title to the money had not passed to the state and municipalities because it was not distributed among them, as is provided by law (section 4143, Statutes), and the sheriff is simply their debtor; also that in placing tax collections in the bank he had violated the terms of section 173 of the Constitution and section 3747 of the Statutes relating to the misuse or misapplication of tax collections. On the other hand, it is submitted, if it was the property of the state, county, and districts, the authority to maintain the claim was not vested in the sheriff but in other officials.

Without undertaking to answer the arguments or quote from authorities, we deem it sufficient for the purposes of this opinion to say that the collecting officer is regarded as a bailee or trustee for the state and municipalities. Commonwealth v. Fisher, 113 Ky. 491, 68 S. W. 855, 24 Ky. Law Rep. 300; Hill v. Fleming, 128 Ky. 201, 107 S. W. 764, 32 Ky. Law Rep. 1065, 16 Ann. Cas. 840; Johnson v. Fleming, 116 Ky. 680, 50 S. W. 855, 21 Ky. Law Rep. 4; United States v. Thomas, 15 Wall. 337, 21 L. Ed. 89. Quite obviously the state and municipal corporations can possess no personal property except through some sort of a bailee. As such the sheriff had the right to maintain the claim and seek to repossess the property of his bailors or cestuis que trust, if any distinction is to be drawn in the designation. City Transfer Co. v. Robinson, 12 Ky. Law Rep. 555; 6 C. J. 1166. A well-considered case on the subject is United States v. Atlantic Coast Line Railroad Co. (D. C.) 206 F. 190. Though apparently the question was not raised, a sheriff's right to make claim for funds deposited by him in a bank subsequently declared insolvent was also recognized in Farmers' Bank of White Plains v. Bailey, 221 Ky. 55, 297 S. W. 938.

3. To sustain the claim of preference in its entirety, it would be necessary to overrule, as appellee argues should be done, the opinion in Farmers' Bank of White

Plains v. Bailey, supra. It was there specifically held that, in the absence of a statute or showing of facts sufficient to create a trust—distinguishable from an ordinary general deposit—no priority is to be awarded the commonwealth over general creditors. It is argued that the opinion is out of harmony with authorities from other jurisdictions and with Johnson v. Fleming, and Hill v. Fleming, supra. The first of these domestic cases involved the right of a litigant to recover of the master commissioner and receiver of a court funds that he had deposited in a bank which became insolvent. Holding that the officer was a trustee of public funds, it was further decided that under the circumstances he was not liable for the loss. The Hill case was a suit by sureties on the bond of a defaulting deputy sheriff who had been subrogated to the rights of a county against one who with notice had accepted payment with tax money of a personal obligation of the officer. Again declaring that the relation of the officer was that of a trustee and not a debtor, there was applied the familiar law that a cestui que trust may follow trust funds and recover them. While the facts of these cases are quite different, the argument of the conflict of the Bailey case with them is bottomed upon the legal conclusion that, being a trustee, funds collected by the officer continue impressed with the trust when deposited in an account so styled as to indicate its characetr, even though it be a general deposit, and that the title of the state and taxing districts is not divested by conditions bringing about insolvency. But the analogy fails in an important particular, as we shall see.

It is uniformly considered that a bank and a general depositor occupy the relation of debtor and creditor under a voluntary contract when not complicated by any further transaction than that of depositing and withdrawing money. Morse on Banks & Banking, sec. 568; Pierson v. Union Bank & Trust Co., 181 Ky. 749, 205 S. W. 906, 2 A. L. R. 172. The same relation exists as the depository of the government. United States Fidelity & Guaranty Co. v. Pensacola, 68 Fla. 357, 67 So. 87, Ann. Cas. 1916B, p. 1240, and notes; Phillips v. Yates Center Nat. Bank, 98 Kan. 383, 158 P. 23, L. R. A. 1917A, 680. The officer is the trustee—not the bank. It is the debtor of the trustee. In the absence of a contract for a special deposit, the deposit by a fiduciary of trust funds, even though there be affixed to his name or to the account the

title "trustee," "agent" or the like, is a general one. 3 R. C. L. 518. The bank may commingle the funds with its own, and so use them. Unless there has been a misappropriation by the trustee with knowledge of the bank, the deposits are not considered as impressed with the trust. 3 R. C. L. 521. In a proper case, the cestui que trust may be enabled to recover of the bank, but knowledge by the depository that the deposit is a trust fund becomes immaterial on the question of preference after insolvency of the bank. Gray v. Elliott, 36 Wyo. 361, 255 P. 593, 53 A. L. R. 554.

Unless the theory of sovereignty or public policy presently noted should be adopted, the trust doctrine would be just as applicable to private as to public trustees, with a resulting right of preference. That right does not exist, as was specifically held in Fidelity & Casualty Co. v. Farmers' & Merchants' Bank of Tolu, 223 Ky. 32, 2 S. W. (2d) 1048.

It is frankly conceded by counsel that other jurisdictions are not in harmony in applying this rule of impressing public money with a trust when placed on ordinary deposit to the credit of a general checking account, as was that here involved. Though the distinctions drawn are interesting, obeying the demands of brevity, we pass on without discussing them. It is sufficient to say that the court is not convinced that it should depart from the conclusion reached in the Bailey case—in which are cited as authority other domestic cases of similar nature—that the better rule is not to adjudge a preference on this theory.

4. Another ground upon which perhaps a majority of those courts which adjudge preference to public funds base their decisions, and one which was not discussed in the Bailey opinion, supra, is that under the common law of England, in the conflict with his subjects, it was the prerogative of the king to require it, and that this continues as an attribute of the sovereign state and one consistent with the principles of free government. 3 R. C. L. 644, and supplement; North Carolina Corporation Commission v. Citizens' Bank & Trust Co., 193 N. C. 513, 137 S. E. 587, 51 A. L. R. 1356; Leach v. Farmers' Savings Bank of City of Hamburg, 204 Iowa 1083, 216 N. W. 748, 65 A. L. R. 679; People v. Farmers' State Bank, 335 Ill. 617, 167 N. E. 804, 65 A. L. R. 1327. These authorities will lead to many others of like effect. It is

suggested by learned counsel for appellee that the divergence from the common law by perhaps a minority of the courts arises out of legislative enactments or the judicial acceptance of the doctrine announced in United States v. Prescott, 3 How. 578, 11 L. Ed. 734 (decided in 1845), which held that the obligation of a receiver of public money was unconditional and absolute, and not that of a bailee for hire. It appears that the Supreme Court departed from that doctrine in United States v. Thomas, 15 Wall. 337, 21 L. Ed. 89, as is discussed in the opinion of Hill v. Fleming, supra. Furthermore, it is suggested that this line of cases is in error, and the Prescott case should not have been nor should be considered an authoritative precedent for those states holding to the common law, since decisions of the federal courts are not controlled or influenced by it. It is clear that, at least in recent cases already cited, we have not subscribed altogether to the doctrine of the Prescott case.

Chancellor Kent held to the view that the states of the Union had no standing as preferred creditors except as their statutes might so provide. 1 Kent's Commentaries, 427-428.

The commonwealth of Kentucky has not hitherto attempted an exercise of the royal prerogative referred to. The common law of England local to that kingdom never became the law of this state, but only the laws of a general nature and suitable to our conditions in force prior to the fourth year of the reign of James I (March 24, 1607) that were adopted by the Virginia Convention of 1776. That ordinance of Virginia became the law of Kentucky until altered by the General Assembly. Hunt v. Warnicke's Heirs, 3 Ky. (Hardin) 66; Ray v. Sweeney, 77 Ky. (14 Bush) 1, 29 Am. Rep. 388. The consideration to be given the laws of the mother country was of engaging importance to our political fathers. Thus in 1808 the General Assembly registered its antipathy to British influences and customs by providing that all reported cases adjudged in the kingdom of Great Britain since July 4, 1776, "shall not be read nor considered as authority in any of the courts of this Commonwealth, any usage or custom to the contrary notwithstanding." 3 Littell's Laws, 475. The early attitude remains, and that law continues with us as section 2418 of the current Statutes.

In the early case (1809) of Com. v. Logan's Adm'rs, 4 Ky. (1 Bibb) 529, wherein the commonwealth was contending that a debt due to it by a decedent was a pre-

ferred claim, it was observed that there was no constitutional or statutory provision to support the contention that the right existed as an incidental prerogative to the same extent as that exercised by and conceded to the crown. But said the court: "Whether such a prerogative belongs to the commonwealth, this case does not require us to decide." We yet have no such provision.

It may be true that money collected for public use is for the benefit of all the people for the maintenance and preservation of the government, that it is important that public obligations should be promptly met, and that the collection of debts due the state and subdivisions are of greater importance to the people as a whole than the recognition of private obligations—in a word, that public policy requires that the governmental agencies should never be deprived of that which has been taken for their necessities. Nevertheless, we think our traditions and history, our jurisprudence and legislative enactments, as expressive of the sovereign will, indicate a contrary public policy on this particular matter. We have, for instance, the establishment of a lien on all property to secure the payment of taxes, and statutes providing that security shall be required of officers and of depositories to insure the safety of public funds, to say nothing of those prohibiting preferences as between creditors of insolvent individuals. Thus in section 4693 of the Statutes, which provides for the giving of surety bonds by state depositories, it is declared that their execution shall not impair or delay "the right of the commonwealth to recover from any delinquent or defaulting bank, or the officers or stockholders thereof, in the same manner as other depositors." Supplementing these legislative pronouncements is the high principle of equity, which abhors preference and favors equality.

To permit the preference would result, in effect, in every depositor in an institution which holds public funds becoming the pledgor of his individual property as a guaranty of the safety of those funds. The remnant of monarchial powers over the property of the citizens which is recognized and perpetuated in some states has no place with us.

We have treated alike the claims made in behalf of the commonwealth and the taxing districts. But it may be observed that, in many of those jurisdictions which have adopted the view of a prerogative right of preference in the state, the principle is not extended to a county,

city, or other municipallty. Bignell v. Cummins, 69 Mont. 294, 222 P. 797, 36 A. L. R. 634; Leach v. Farmers' Savings Bank of City of Hamburg, supra.

The court therefore concludes that, in the absence of a controlling statute, the ownership of public funds cannot be regarded as of a higher quality than that of private funds. The sheriff's claim is to be considered on an equal footing with other general depositors.

5. We come now to the second major proposition, which requires a statement of the evidence.

It appears in the record that for several years Ed Gardner, president of the First National Bank of Mayfield, had exercised active management and control over the Hickman Bank & Trust Company, although he had no official connection with it. Its out-of-town business was cleared through the Mayfield bank, for which service it paid liberally. It discounted notes to, and borrowed money from, that institution at the rate of 8 per cent. Those transactions aggregated about $300,000 in 1929. John Pyle, the cashier of the Hickman Bank, who had been ill and absent for three months, came to the bank on Saturday, December 28th, and then learned that it was in financial distress. Among other things, there was a large overdraft on the Mayfield bank. It had been reduced from about $35,000 on the 26th to about $19,000 on the 28th. The Hickman Bank also owed it $25,000, secured by collateral of the stated value of $41,429.17. It is in evidence that theretofore the Mayfield bank had come to the relief of the Hickman Bank in times of stringency, and during that Saturday afternoon there was a telephone conversation between Gardner and Pyle or Johnson, the assistant cashier, in which Gardner was advised of the precarious condition. He stated that he would come over Monday morning to see about it. Pyle admits that he knew then the bank was in an unsafe and desperate situation, but he relied on Gardner coming to its rescue, as he had done upon former occasions, and did not inform the president and other directors of the condition, except perhaps Travis, the vice president. There is nothing in the record to indicate that at the time Pyle's faith was unfounded, but it is shown by a statement of Gardner several days later that on the intervening Sunday he had visited O. S. Denny, banking commissioner, at his home in Marion, Ky., and told him of his (Gardner's) purpose to close the Hickman Bank on the next

morning. But the officers of the Hickman Bank were ignorant of this.

To go back a little and to give the facts sequentially: The sheriff had deposited before this Saturday an aggregate of $9,738.85, of which $2,459.22 was on Friday. During Saturday he made a deposit of $165 in currency, and just after the bank had closed for that day at 4 o'clock he deposited $2,206.89 additional.

The bank opened for business as usual on Monday. Gardner came, and the directors were called in. At the meeting they were advised of the situation for the first time. There Gardner declared he had kept the bank examiner off the bank for two years so it could run, but he now refused to finance it further, and stated it would have to close unless some one else furnished it with money. The directors present voted to close the bank and place it in the hands of the banking commissioner for liquidation immediately, and a resolution was drafted to that effect and posted on the door about 11 o'clock. Within less than thirty minutes before this notice was posted, and while the meeting of the directors was in progress, the appellee deposited $6,361.08.

The record shows that Gardner, as a special deputy banking commissioner, promptly took charge as liquidating agent. There was $28,579.38 in cash on hand, and with this he satisfied the overdraft due his bank. When the closing entries of the bank had been made by or for him its books (at least as shown in this record) showed no indebtedness to the First National Bank of Mayfield.

The trial court held that no preference was to be granted because the deposits were public funds, but he adjudged that the appellee was entitled to recover the entire sums deposited on Saturday and Monday as above stated (aggregating $8,734.97), apparently upon the ground that the bank was insolvent when those deposits were made.

The claim to a right of preference in the distribution of the assets of an insolvent bank by reason of a deposit having been accepted after insolvency has given rise to many cases in other jurisdictions. Recovery is permitted on the theory that a trust ex maleficio is created in favor of the depositor. There is a wide divergence as to the particular conditions which will authorize the recoupment. Some courts apply a very liberal rule and others are somewhat drastic. Mitchie on Banks and Banking, secs. 73-75; Morse on Banks and Banking, sec. 629;

Richardson v. New Orleans Debenture Redemption Co., 42 C. C. A. 619, 102 F. 780, 52 L. R. A. 67; Steele v. Allen, Com'r of Banks, 240 Mass. 394, 134 N. E. 401, 20 A. L. R. 1206; Raynor v. Scandinavian-American Bank, 122 Wash. 150, 210 P. 499, 25 A. L. R. 716; Washington Shoe Manufacturing Co. v. Duke, 126 Wash. 510, 218 P. 232, 37 A. L. R. 611; Leach v. Farmers' Savings Bank, 204 Iowa, 1038, 216 N. W. 748, 65 A. L. R. 679. These authorities will lead to many others.

Without undertaking to analyze the authorities or state our reasons for discarding many of the conclusions reached in other cases, we conclude that there must have been a real fraud committed on the depositor, and that, before he will be permitted to rescind and be adjudged a preference in the distribution of the assets of the insolvent bank, the following elements must concur: (1) Insolvency of the bank, that is, it must be in such condition that it cannot pay its debts and depositors in the usual and ordinary course of business; (2) actual knowledge of such insolvency by the directors or the cashier or other officer charged with its management; (3) ignorance of the insolvency on the part of the depositor; (4) the deposit must have been received with no intention or no reasonable expectation of repaying same on demand in the usual course of business; (5) the deposit must be in, or have augmented, the assets going into the hands of the receiver, or other liquidating agent; (6) the depositor must have taken seasonable action to rescind.

Applying this rule to the facts: There is no difficulty encountered in determining that the deposits of Thompson before that made just as the bank closed on Saturday afternoon cannot be recovered. At the time of its reception, all of the stated elements seem to have been present, except the second and the fourth. By reason of the relations which had existed and were then existing with the Mayfield bank, which have been stated with some fullness, the cashier of the Hickman Bank was justified in hope and belief (as he testified) that, when Gardner arrived Monday, he would come to the rescue and relieve the situation, as he had done in times past. This was fortified by the fact that the Mayfield bank held its collateral worth $16,500 more than its bills payable, and the overdraft was only $19,000. Under the circumstances, those in charge of the bank did have a reasonable expectation of repaying the deposit on demand in the usual course of business.

But a different situation existed when the deposit of Monday morning was made. The record does not disclose the exact moment when it was definitely and finally determined that the bank must cease doing business. It does, however, show that the directors were in session and had been for some little time considering the matter. They had been called together at Gardner's instance, and he was present. It is to be assumed that the board at the beginning learned of the situation, and were informed by Gardner that he was unable to render the necessary assistance. After making his deposit, Thompson had had time only to get to his office in the court-house near by when he learned that the bank had been closed. When this deposit was accepted, there can be no doubt that the bank's directors and officers could have had no reasonable expectation of repaying the deposit on demand in the usual course of business.

There is no evidence that any money had been paid out during the few minutes intervening. But, if there had been, it would be presumed that the bank used its own cash and retained that which under the law it had no right to use. Farmers' Bank of White Plains v. Bailey, supra; Willoughby v. Weinberger, 15 Okl. 226, 79 P. 777. Hence the Monday morning deposit must have been in the assets going into the hands of the liquidating agent.

It appears, therefore, that only as to this deposit of $6,361.08 the conventional relation of debtor and creditor never arose; that it was impressed with a trust which permits the appellee to trace it, as he has seasonably done, into the hands of the appellant and entitled him to a recovery.

Accordingly, the judgment is affirmed on the cross-appeal and reversed on the direct appeal to the extent indicated.

Whole court sitting.