## Commonwealth v. Polk, Court Clerk, et al.

(Decided Oct. 30, 1934.)

BAILEY P. WOOTTON, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellant.

WHEELER, WHEELER & SHELBOURNE for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

John W. Polk was elected clerk of the McCracken county court, on the 4th day of November, 1929, and on being inducted into office, executed bond to the commonwealth of Kentucky, required by section 373, Kentucky Statutes, conditioned that he "will faithfully discharge all and every duty of the office."

Section 2739g-62, Kentucky Statutes, imposed upon him, as county clerk, the duty of collecting the fees due the state, as provided by the act of which this section is a part, and to report and remit each month to the State Tax Commission "all moneys collected during the previous week * * * and make all checks payable to the state treasurer." Upon his failure so to report and remit, as provided in the act, "for more than seven [7] days after the same is due, he shall be required to pay a penalty of ten per cent. [10%] on the amount of money due in addition thereto."

Prior to January 3, 1931, Polk, as clerk of the county court of McCracken county, collected from the owners of motor vehicles, license taxes aggregating $1,-362.67, but failed and refused to pay it to the state treasurer.

The commonwealth of Kentucky, by proper officers, instituted this action in the Franklin circuit court, wherein it set forth these facts, and sought to recover of Polk the $1,362.67, the 10 per cent. penalty and interest at the rate of 6 per cent. per annum, from January 10, 1931, until paid.

As his defense, Polk pleaded that on December 31, 1930, as county clerk, he had collected from the tax-

payers and automobile owners of McCracken county, license taxes on automobiles and other taxes, and at 4:30 o'clock p. m., December 31, 1930, he deposited in a bank in the city of Paducah, Ky., $9,547.06, being the entire amount collected by him up to that hour; that this deposit was made two and a half hours after the regular closing hour of the banks of the city; and that the time of making this deposit was less than an hour before the end of the business hours on that date in the city. To use his language, the deposit "was made at the latest hour at which this defendant could deposit in said bank, or any bank, in the city of Paducah, funds collected by him as county clerk of McCracken County"; "that in spite of the late hour at which said deposit was made, automobile license taxes to the amount named in the petition, viz, One Thousand Three Hundred and Sixty-two Dollars and Sixty-Seven Cents [$1,362.67] were paid him by taxpayers and automobile owners of McCracken County, Kentucky, after 4:30 o'clock P. M. * * * That it was the duty of this defendant to accept same in payment of said license taxes, that he was required to, and did, accept same in his official capacity as county clerk of McCracken County." "The amounts so collected by him, after 4:30 o'clock P. M., * * * were placed by him and his deputies in a strong, iron safe in his office in the court house in the city of Paducah, Kentucky," which "was equipped with a combination lock and could not be opened or entered by persons ignorant of said combination lock," which was known "only to the defendant and some of his trusted deputies"; the "safe was locked in the office of the defendant in the court house building in the city of Paducah," and the "office was closed at about the hour of midnight on December 31st, 1930 and the court house building was locked. He asserts that after 4:30 o'clock p. m., on that date, the safety deposit vaults in all of the banking houses of the city were closed; "that there was no place in the county of McCracken, or elsewhere, where this defendant could have more safely kept or guarded said funds after 4:30 o'clock P. M. on said date."

He also alleges "that in the precaution taken by him to guard and protect said funds, he exercised ordinary care and exercised a higher degree of care than that exercised by ordinary, prudent persons in their own affairs and in protecting their own property or funds in like or particular circumstances"; but in spite

of the precaution taken by him, as aforesaid, that sometime between midnight, when his office was closed and the safe securely locked and the combination set, and 6 o'clock a. m., on January 1, 1931, "thieves, burglars, bandits or criminals, unknown to the defendant, and without his knowledge, broke into the court house building, entered same, broke into his office and entered same, removed the safe from the office by dragging or rolling it into another part of the court house, and by the use of high explosives, broke open its door and removed therefrom the contents, including the $1,362.67," the sum sued for. "He states that he was not protected or indemnified in any sum by insurance in said loss by burglary or robbery, and that it has since been impossible for him to recover or collect, in whole or in part, the amount so lost." He asserts that he exercised a higher degree of care than that imposed upon him as bailee or trustee of the funds, in his hands as county clerk. These facts were pleaded as a bar to a recovery of the $1,362.67.

He endeavors to substantiate these allegations by his own testimony; that of Flint F. Sellers and Willard C. Landfear, regular deputies in his office; Ernest Wilson, janitor of the county courthouse; and Claud Graham, sheriff of the county.

The facts not being disputed, the determinate question becomes one of law.

Both the commonwealth and Polk recognize two distinct rules of liability of an officer having custody of public funds. The commonwealth insists that Polk's liability is that of an insurer. He contends that his liability is that which the common law imposes on him as bailee or trustee, and his common-law liability was not enlarged by his official bond; that it simply afforded security for the performance of his duties, and the fact his safe was violently robbed in the nighttime, of money belonging to the state, is a valid defense to this action on his official bond for the recovery herein. To sustain his insistence he cites to us: Breckinridge County v. Gannaway, 243 Ky. 49, 47 S. W. (2d) 934, 936; Johnson v. Fleming, 116 Ky. 680, 50 S. W. 855, 21 Ky. Law Rep. 4; Sweeney v. Com., 118 Ky. 912, 82 S. W. 639, 26 Ky. Law Rep. 877; Denny, Banking Commissioner v. Thompson, 236 Ky. 714, 33 S. W. (2d) 670; Edwards v. Logan County, 244 Ky. 296, 50 S. W. (2d) 83; Hill v. Fleming,

128 Ky. 201, 107 S. W. 764, 32 Ky. Law Rep. 1065, 16 Ann. Cas. 840; Commonwealth v. Fisher, 113 Ky. 491, 68 S. W. 855, 24 Ky. Law Rep. 300; Commonwealth v. Bodley, 31 S. W. 463, 17 Ky. Law Rep. 561; State v. Houston, 78 Ala. 576, 56 Am. Rep. 59, and Jordon, County Atty., v. Baker, County Judge et al., 252 Ky. 40, 66 S. W. (2d) 84, 87.

To sustain the argument that the "Kentucky authorities commit this court to the law enforcing strict liability of an officer holding public funds," the commonwealth cites to us section 3746, Kentucky Statutes; Johnson v. Fleming, Commissioner, 116 Ky. 680, 50 S. W. 855, 21 Ky. Law Rep. 4; Goodloe v. Fox, 96 Ky. 627, 29 S. W. 433, 16 Ky. Law Rep. 653; Commonwealth v. Tate, 89 Ky. 587, 13 S. W. 113, 12 Ky. Law Rep. 1; Griffith v. Com., 10 Bush, 282; Commonwealth v. Godshaw, 92 Ky. 435, 17 S. W. 737, 13 Ky. Law Rep. 572; Taylor, Drainage Commissioner, v. Fidelity & Cas. Co. of New York, Inc., et al., 246 Ky. 598, 55 S. W. (2d) 410; Edwards v. Logan County, 244 Ky. 296, 50 S. W. (2d) 83.

In Board of Education of Jackson v. Hatton et al., 253 Ky. 828, 70 S. W. (2d) 923, we considered the question of liability of a collector of taxes for school purposes, where his failure to account for the fund was due to the insolvency of a bank when he had exercised ordinary care in selecting the bank in which to deposit the fund. In Breckinridge County v. Gannaway, supra, the right of the county to recover of its sheriff, and his surety, the taxes collected by him and the liability of the sheriff therefor, were involved. The sum sought to be recovered was deposited to his credit, as sheriff, in two banks at the county seat, after it was collected by him. The county insisted the sheriff was liable absolutely and at all hazard for the actual payment of the money collected by him. The prior opinions of this court were reviewed and the liability of a bailee was discussed, followed by this statement:

"We shall not attempt to reconcile these cases, nor is it necessary in the instant case to choose between the two conflicting principles."

In Jordon, County Atty., v. Baker, County Judge, et al., the sheriff of Knox county collected taxes for the county and the County Board of Education, which he deposited in separate accounts in his official capacity in

the First National Bank of Barbourville. After making the deposits, but before he was required by law to make a settlement with, and pay over to, the proper authorities, the funds in his hands, the bank closed its doors and continuously remained in that situation. But there was nothing in the record showing it was insolvent, or that its assets, when eventually liquidated, would be insufficient to meet its obligations and especially those of its depositors. In our opinion disposing of the questions involved therein, it was written:

> "There is a marked divergency of opinion among the various courts of the country as well as the views of text-writers," "as to what is the correct measurement of the liability of a collector of taxes and other public funds if for any cause they should become lost and unavailable for payment to the proper governmental authority when payment is due." "The true situation is depicted in our recent opinion rendered in the case of Breckinridge County v. Gannaway, 243 Ky. 49, 47 S. W. (2d) 934, 935."

Our final conclusion in the Jordon Case was thus stated:

> "After mature deliberation, and in view of the changed conditions referred to, and in the absence of any statute to the contrary, we have arrived at the conclusion that those courts adopting and approving the 'bailee' rule are more in accord with what we think is the correct one under modern conditions than are the courts adopting and applying the 'insurance' rule. Such conclusion not only harmonizes with the above-defined status and relationship sustained by the officer toward the collected fund [and which could not be true under the insurance rule], but it also affords equal protection to the public against dishonesty and graft, carelessness and imprudence, and other forms of selfishness and indifference, as is done under the 'insurance' rule."

It may be safely stated, whatever previous confusion or divergency may have existed in our own opinions bearing on this topic, or in those of the courts of other jurisdictions, our opinion in the Jordon Case must be accepted as final and conclusive that the rule of "strict liability" or that of an insurer does not control,

in this jurisdiction, the liability of an official and his surety for public funds lost while in the officer's custody, but it is controlled by that of the "bailee" rule.

In the Jordon Case the term "bailee" or "bailment" is not defined. The application of the "bailee" rule in that case must be considered in connection with the facts therein. By our application of it in that case, we did not mean that in every stated case, without regard to the facts, the "bailee" rule absolves the officer of liability for public funds in his custody. Every case must be determined by the "bailee" rule on the particular facts.

The authorities are not entirely in accord as to what the term "bailee" or "bailment" exactly comprehends. It seems that the various definitions frequently to be met with in the books fall naturally into two groups; those which, following Blackstone and Story, include contracts where the return of the goods is not contemplated, and those which, following Kent and Jones, exclude such contracts. 3 R. C. L. sec. 2 p. 72. By some of the courts, "bailment" has been defined to be "a delivery of the thing in trust for some special object or purpose, and upon a contract, expressed or implied, to conform with the object of the purpose of the trust." New Jersey Elec. Ry. Co. v. New York, L. E. & W. R. Co., 61 N. J. Law, 287, 41 A. 1116, 43 L. R. A. 849. By others, it has been defined as "a delivery of goods in trust upon a contract, expressed or implied, that the trust shall be duly executed, and the goods restored by the bailee as soon as the purpose of the bailment shall be answered." Gibson v. Bessemer & L. E. R. Co., 226 Pa. 198, 75 A. 194, 27 L. R. A. (N. S.) 689, 18 Ann. Cas. 535.

According to Justice Story (4th Ed.) sec. 1, p. 2, it is derived from the French word "bailer," which signifies "to deliver." And in Ruling Case Law (3 R. C. L., sec. 2, p. 73), it is stated:

"In its ordinary significance which conforms to modern authorities and is substantially accurate, and may be said to import a delivery of personal property by one person to another in trust for a specific purpose, with a contract, expressed or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when

the specific purpose is accomplished or kept until bailor claims it.''

Jensen & Eagle Ore Co., 47 Colo. 306, 107 P. 259, 33 L. R. A. (N. S.) 681, 19 Ann. Cas. 519. The word ''faithfully,'' as used above, and as we shall hereinafter apply it, means ''a conscientious diligence or faithfulness, adequate to the due execution of the object of the bailment''; or ''a just regard of adherence to duty, or a due observance of the undertaking of a contract.'' Story on Bailments (9th Ed.) sec. 3, p. 8.

The term ''bailment,'' as it is generally defined, embraces the duty of the bailee to exercise the utmost good faith, and it is conceded it is his duty to exercise diligence in the performance of his duties. As Justice Story has aptly stated:

''There are infinite shades of care or diligence from the slightest momentary thought to the most vigilant anxiety. * * * There may be a high degree of diligence, a common degree of diligence, and a slight degree of diligence. * * * Indeed, what is common or ordinary diligence is more a matter of fact than of law. And in every community it must be judged by the actual state of society, the habits of business, the general usages of life and the dangers, as well as the institutions peculiar to the age. * * * It will thence follow, that, in different times and different countries, the standard is necessarily variable with respect to the facts, although it may be uniform with respect to the principle. So that it may happen that the same acts which in one country or one age may be deemed diligent acts, may at another time in another country be justly deemed not the exercise of ordinary diligence. * * * And what constitutes ordinary diligence may also be entirely affected by the known bulk and the value of the article. A man will not be expected to take the same care of a bag of oats, as a bag of gold; of a bale of cotton, as a box of diamonds, or other jewelry; of a load of common wood, as of a box of rare paintings; of a crude block of marble, as of an exquisitely sculptured statue. The value especially has an important ingredient to be taken into consideration upon every question of negligence; for that may be gross negligence in the case of a parcel of extraordinary value,

which in case of a common parcel may not be so. * * * The degree of care that may reasonably be required to take of a thing * * * essentially depends upon the quality and value of a thing and the temptation thereby afforded to theft. A bailee, therefore, ought to proportion his care to the injury or loss, which is likely to be sustained by any improvidence on his part. * * * In short, diligence is usually proportioned to the danger of loss; and the danger is, * * * compounded of very different elements."

"Men intrusted with money might at some times and in some places be required to go armed; when, at other times and in other places, such a precaution would be deemed wholly unnecessary."

"Where there are, comparatively speaking, few temptations to theft, it is usual to leave barns, in which horses and other cattle are kept, without being under lock by night. But in our cities, where the danger is much greater, and the temptations more pressing, it would be deemed a great want of caution to act in the same manner. If a man were, in many country towns, to leave his friend's horse in his field or in his open barn all night, and the horse were stolen, it would not be imagined that any responsbility was incurred. But if in a large city the same want of precaution were shown, it would be deemed in many cases a gross neglect. If robbers were known to frequent a particular district of country, much more precaution would be there required than in districts where robberies were of very rare occurrence. What, then, is usually done by prudent men in a particular country in respect to things of a like nature, whether it be more or less in point of diligence than what is exacted in another country, becomes, in fact, the general measure of diligence." Story on Bailments (9th Ed.) secs. 13, 14, pp. 16, 17.

In connection with Justice Story's statement of principles, it is indispensably essential to consider the terms "gross negligence," "ordinary care," and "slight neglect," as those terms are used in the law of bailment. Jones on the Law of Bailment defines them thus:

"Gross neglect, lata culpa, is the omission of

that care which even inattentive and thoughtless men never fail to take care of their property.''

''Ordinary neglect, levis culpa, is a want of that diligence which the generality of mankind use in their own concerns; that is, of ordinary care.''

''Slight neglect, levissuma culpa, is the omission of that care which very attentive and diligent persons take of their own goods, or in other words, of very exact diligence.''

The rule for determining the liability of an officer and his surety for the loss of public funds intrusted to the former's custody, in those jurisdictions where the ''strict liability'' rule does not prevail, as it is deducible from the weight of authority, is, where the funds in his custody have been lost by burglary, robbery, or theft, the burden is upon the officer to establish by clear and convincing evidence that he faithfully exercised for the protection and safety of the funds against such acts of violence, very exact diligence, or extraordinary diligence which is an equivalent of the modern phrase ''the highest degree of care'' as it is used in the law of bailment, which includes the duty to protect the funds in his custody, personally, with reasonably adequate office equipment, and to use foresight and precaution, if the time, place, and conditions require it or seem to demand it, to provide a guard or watchman in the office, if it is used even in an emergency in the nighttime, as a depository for the funds, or if obtainable, to secure in advance and carry insurance on the contents of the depository in his office, if it is used habitually for that purpose, or any other modern means or methods devised and in use, to secure such a fund against loss by burglary, robbery, or theft.

The basic reason for this rule is that a burglary, robbery, or theft of public funds in time of profound peace, can be so easily simulated, and a collusion so successfully planned and executed by dishonest officers, the application and enforcement of a less strict rule would defeat the purpose of the law exacting of officials a faithful accounting of public funds in their custody.

For cases in which officials have been held accountable for public funds stolen while in their custody, see Coe v. Foree, County Judge, 20 Tex. Civ. App. 550, 50 S. W. 616, 617; State v. Nevin, 19 Nev. 165, 7 P. 650, 3

Am. St. Rep. 873; New Providence v. McEachron, 33 N. J. Law, 341; Mansfield v. Hanaford, 250 Mass. 562, 146 N. E. 39; City of New York v. Fox, 189 App. Div. 448, 178 N. Y. S. 805, 810; Seward v. National Surety Co., 120 Ohio St. 53,. 165 N. E. 537.

Considering, without deciding, that the facts pleaded as a bar to a recovery are sufficient, when tested by a demurrer, to constitute a defense, an examination of the evidence discloses that Polk has established no more than ''ordinary care'' as this term is applied to less onerous duties of bailees generally, and not the quantium of exact diligence, or superimposed care which the law exacts of the custodian of a public fund, to protect from burglary or theft the fund sued for. It is shown by the testimony that his latest deposit in the bank was at 4:30 o'clock p. m. And whilst he testifies, "It was as late as we were able to make any arrangements about any deposits," but he nowhere states that he ever requested the official of the bank, with whom he made the deposit at 4:30, to receive a deposit at a later hour. Nor does he produce the official with ·whom he dealt at 4:30 for the purpose of showing whether a request would have been granted, if made, to receive a deposit at a later hour, because of the emergency. The safe in which he claims the money was placed in his office ''was a steel, bank safe; about eight inches thick, with a door of about the same thickness.'' The walls of the safe ''were cast iron or steel filled with cement.'' It was equipped with a combination lock. After the money was placed in it, the combination was turned on and set. He testified, and his testimony was corroborated, that he closed the office, locked the door, and left for his residence about the hour of midnight, and between the hour of his departure and the next morning, the safe was removed from his office to the ladies' rest room in the courthouse, where it was found ''with the opening up and the door completely torn off,'' or ''torn away,'' and the safe empty. When he was asked if the outer doors of the courthouse were locked, his response was: ''The janitor is always instructed to lock up the outer doors.'' He was asked if he carried ''any burglary or other insurance,'' from which he could reimburse himself in any amount on account of the loss of the funds, traceable to the robbery; and his response was, ''I did not.'' On returning to the office on the next morning, the door of the clerk's office ''had been 'jimmied.' '' A door in the

basement of the building had been prized open. At the time he left his office, on the night of the burglary, Polk made no investigation to ascertain and did not know whether the doors of the courthouse were locked, or unknown persons were secreted within the building. The sheriff and others had keys to the courthouse and were in the habit of entering and leaving it in the nighttime. The janitor claims he had locked the doors of the courthouse on the evening of the night of the robbery, before his departure for home; but this fact was not known by Polk at the time he closed his office.

It is not disputed that Polk not only left no guard or watchman in his office but carried no insurance on the contents of the safe in the office, securing him against the loss thereof by burglary or theft, and he made no effort, used no foresight or precaution so to protect the fund deposited in the safe in his office against such loss; nor does he claim he had made an effort, but could not obtain insurance thereon. And he offers no excuse for not leaving a guard or watchman in the office to guard the fund from midnight until daylight. On leaving his office on the night of the burglary, he left about $2,000 of the state's funds, consisting of $1,362.67 in cash, and the balance in checks, in the safe, unprotected by either a light in the office, or a guard or watchman, knowing it was unprotected by insurance. The $2,000 was collected by him after 4:30 o'clock p. m. The fact the banks were closed and that the safe in his office was used by him as a depository of the funds collected after that hour was doubtless suspected or known to persons, or some of them, who had paid him, after that hour, the funds on hand at the hour of closing his office.

The structure of the safe in which the funds were deposited and the door to his office, though locked, afforded slight, if any, protection of the contents of the safe against modern methods of burglary and theft. The presence in the office of a guard or watchman would have afforded infinitely greater protection of the fund than the small safe and the locked door of the office.

It is common knowledge that nowadays burglary, robbery, and theft at the countryside, in hamlets and villages and cities, are almost as frequent as robbery was on the road from Jerusalem to Jericho in the days of the "Good Samaritan." It is not unfair to Polk to assume that he had the general information of the fre-

quency of these crimes, everywhere, in these modern days of crime, which is possessed by the average laymen. Attributing to him common knowledge and measuring the developed facts herein by the principles reiterated, we are convinced that Polk has not established by the evidence that he exercised that degree of care which the law exacted of him for the protection of the public funds in his custody.

In so concluding, we would not be understood as departing from our pronouncement in the Jordon Case, supra, but only extending and explaining it by declaring the proper measure of the required diligence and care to be exercised by a bailee of public funds.

Wherefore, the judgment is reversed for proceedings consistent herewith.

The whole court sitting.