**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 6, 2013

No. 12-10677

Lyle W. Cayce
Clerk

In the Matter of: ROBERT DEAN SCHOOLER; TINA MARIE SCHOOLER,

Debtors

LIBERTY MUTUAL INSURANCE COMPANY,

Appellant

v.

UNITED STATES OF AMERICA BY LAMESA NATIONAL BANK,

Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before KING, DAVIS, and ELROD, Circuit Judges.

KING, Circuit Judge.

In 2009, the United States by Lamesa National Bank filed suit against Liberty Mutual Insurance Company, asserting that Liberty Mutual was liable under a federally-required surety bond for the alleged misconduct of its principal, a trustee in a Chapter 7 bankruptcy proceeding. After a trial on Lamesa's claim, the bankruptcy court concluded that the trustee had committed gross negligence, causing damages to the bankruptcy estate in the amount of $112,247.66. The court also held that, as the trustee's surety, Liberty Mutual

No. 12-10677

was liable for those damages under the terms of the bond. The bankruptcy court therefore ordered Liberty Mutual to remit $112,247.66 to the bankruptcy estate for distribution to the estate's creditors. Liberty Mutual appealed the bankruptcy court's judgment to the district court, which affirmed. Liberty Mutual now appeals to this court. For the following reasons, we also AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 21, 2001, Robert and Tina Schooler filed for Chapter 7 bankruptcy in the Northern District of Texas. Immediately thereafter, the bankruptcy court appointed Deborah Penner a Chapter 7 trustee (the "Trustee") for the bankruptcy estate. The Trustee is an attorney who, in addition to serving as a trustee in Chapter 7 bankruptcy cases, has a law practice that includes collection and probate work. Like other trustees operating in the Lubbock Division of the Northern District of Texas, the Trustee was covered under a blanket surety bond issued by Liberty Mutual Insurance Company. As relevant, the bond provides that the Trustee, "as [p]rincipal, and Liberty Mutual Insurance Company, as surety, are held and firmly bound unto the United States," in accordance with 11 U.S.C. § 322(a), jointly and severally "for the faithful performance of [the principal's] official duties as Trustee of the estates of . . . debtors assigned to the [p]rincipal by the United States Trustee."[1]

After the Schoolers filed for bankruptcy, but within the 180-day statutory window for the inclusion in the estate of inherited assets, Mrs. Schooler's father, Hank Gremminger, Jr., died.[2] Mrs. Schooler was named independent executrix

---

[1] As discussed *infra*, 11 U.S.C. § 322(a) provides that a person selected to serve as trustee must "file[] with the court a bond in favor of the United States conditioned on the faithful performance of [his or her] official duties."

[2] Pursuant to 11 U.S.C. § 541(a)(5), a debtor's estate includes property he or she "becomes entitled to acquire," *inter alia*, "by bequest, devise, or inheritance" occurring within 180 days of the filing of a bankruptcy petition.

of Gremminger's will, and was left a one-half interest in his estate, which included real estate, cash, and other assets. Six days after Gremminger's death, Mrs. Schooler filed an application to probate her deceased father's will.

Lamesa National Bank is an unsecured creditor of the Schoolers that has filed several proofs of claim in the Schoolers' bankruptcy case, aggregating approximately $143,644.00. Upon learning of Mrs. Schooler's appointment as executrix of the Gremminger estate, Lamesa's counsel sent a letter to the Trustee expressing concern that Mrs. Schooler might misappropriate the inherited assets belonging to the bankruptcy estate. In that letter, Lamesa proposed that the Trustee assert entitlement to act as executor of the Gremminger estate and to conduct discovery into the nature of the assets involved, including any that might have passed to Mrs. Schooler as a result of non-testamentary transfers. Lamesa also sent a letter to the attorney assisting Mrs. Schooler in probating Gremminger's will, advising him that Mrs. Schooler had not informed the Trustee of the inheritance, and that the Trustee was entitled to take control of the probate estate. Lamesa sent a copy of this letter to the Trustee.

In response, Mrs. Schooler initially took the position that she could disclaim the inheritance, thereby purportedly preventing it from passing to the bankruptcy estate. In correspondence to the Schoolers' bankruptcy counsel, the Trustee disputed this claim and warned that the Schoolers were required to amend their bankruptcy filings and list all property to which Mrs. Schooler had become entitled as a result of her father's death. The Trustee continued that she was "concern[ed] that Mrs. Schooler may not be the [b]est person to serve as Independent Executrix of her father's probate estate," and that the matter needed "to be discussed at length to determine whether the creditors' interest [could] be adequately protected if she serve[d] in that capacity." The Trustee

sent a similar letter to the attorney assisting Mrs. Schooler with the Gremminger probate matters.

Both attorneys assisting the Schoolers responded quickly with reply letters to the Trustee. In essence, those letters continued to express the view that Mrs. Schooler had the right to disclaim her inheritance; that she was permitted to "retain personal property that may be claimed as exempt property"; and that she could use certain assets in the Gremminger probate estate "to pay the bills." The Schoolers' bankruptcy counsel advised the Trustee to "let [him] know promptly" if she had any "disagreement with [his] presumption[s]" about these matters. This series of letters made apparent that the Schoolers were not conceding that the bankruptcy estate had any rights to the inherited assets.

In subsequent letters sent to the Schoolers' bankruptcy counsel, Lamesa continued to express concern over Mrs. Schooler's management of the Gremminger probate estate. In one letter, Lamesa's counsel specifically addressed worry over "the fact that Mrs. Schooler is in possession of over $50,000 [in] cash," and he advised the Schoolers' attorney that "[t]his money should certainly be turned over to the Chapter 7 Trustee, and I will be asking the Trustee to make a motion for such relief if Mrs. Schooler will not do so voluntarily." The Trustee received copies of each of these letters.

In February 2002, the Schoolers amended their bankruptcy filings to reflect Mrs. Schooler's undivided one-half interest in the Gremminger estate. The filings listed various assets as exempt, however, and stated that Mrs. Schooler's sister, herself a beneficiary under the Gremminger will, was claiming an interest in the estate's real property that would have reduced significantly Mrs. Schooler's interest therein. Later that month, Mrs. Schooler filed an "inventory, appraisment, and list of claims" in the probate estate reflecting a total property inventory valued at $252,606.97—an amount later amended to $276,823.77.

No. 12-10677

At Lamesa's request, a Rule 2004 examination of Mrs. Schooler, at which the Trustee was present, was conducted on March 15, 2002.[3] Following that examination, which revealed various details about the Gremminger estate's assets, Lamesa continued to write letters to the Trustee expressing frustration over Mrs. Schooler's management of the Gremminger estate. In particular, Lamesa's attorney raised the concern that Mrs. Schooler intended to spend the cash in the probate estate. Lamesa therefore repeatedly urged the Trustee, in letters sent between 2002 and 2005, to take possession of the cash, real property, and other assets in the Gremminger estate.

Lamesa's pleas went unheeded. Prior to March 2005, the Trustee made no formal demand that the Schoolers turn over assets from the Gremminger estate to the bankruptcy estate. Similarly, the Trustee did not request that the probate court appoint an alternate executor, nor did she pursue any action in the bankruptcy court to protect the bankruptcy estate's interest in the Gremminger estate. Not until March 7, 2005, did the Trustee demand by letter that the Schoolers turn over to the bankruptcy estate all assets to which Mrs. Schooler became entitled as a result of her father's death.

Unfortunately, the letter was too late. Although not discovered by the Trustee until April 2009, the real property in the Gremminger estate had been sold in September 2004, and cash from the probate estate had been disbursed to Mrs. Schooler between 2002 and 2004. By 2005, all of the Gremminger assets disbursed to Mrs. Schooler had been dissipated. This notwithstanding, from 2003 to 2008, the Trustee filed annual reports inaccurately indicating that she

---

[3] Rule 2004 allows any party in interest in a bankruptcy proceeding to move for a court order allowing an examination of the debtor related "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004.

5

No. 12-10677

had obtained either actual or constructive possession of assets from the Gremminger estate belonging to the bankruptcy estate.

In February 2009, Lamesa filed a motion in the bankruptcy proceeding to compel the Trustee to perform her duties, or, alternatively, to remove her. Only after the bankruptcy court set a hearing for that motion did the Trustee file an adversary proceeding seeking from Mrs. Schooler the assets in the probate estate. The Trustee did not discover that Mrs. Schooler had dissipated those assets until she later conducted a court-ordered Rule 2004 examination of Mrs. Schooler.[4]

Lamesa subsequently filed against Liberty Mutual the adversary proceeding that is the subject of this appeal. In its amended complaint, Lamesa alleged that Liberty Mutual, as surety under the Trustee's bond, was liable for the Trustee's failure to "faithfully perform the duties of [a] Chapter 7 trustee." The complaint further alleged that the Trustee's conduct "breached the condition of [Liberty Mutual's] blanket bond," thereby obligating Liberty Mutual "to make [Lamesa] whole for the damages it . . . suffered by reason of [the Trustee's] breach of duty."

Following a trial on Lamesa's claim, the bankruptcy court concluded that, contrary to Liberty Mutual's argument, Lamesa's suit was not time-barred. The court further held that the Trustee's gross negligence caused damages to the bankruptcy estate in the amount of $112,247.66, and that Liberty Mutual was liable for those damages as the Trustee's surety. The court therefore ordered Liberty Mutual to remit that amount to the bankruptcy estate for distribution to the estate's creditors. Liberty Mutual appealed the bankruptcy court's judgment to the district court, which affirmed.

---

[4] The Trustee eventually entered into a settlement agreement with Mrs. Schooler whereby $12,000 was recovered for the bankruptcy estate.

No. 12-10677

Liberty Mutual once again appeals, raising four challenges.  First, it contends that the bankruptcy court erred in concluding that Lamesa's claim was not time-barred.  Second, it asserts that the bankruptcy court erred in finding the Trustee grossly negligent in her administration of the Schoolers' bankruptcy estate.  Third, it argues that the bankruptcy court erred in finding the Trustee grossly negligent without having heard expert testimony concerning the appropriate standard of care.  Finally, it maintains that the bankruptcy court erred in calculating the damages resulting from the Trustee's alleged gross negligence.[5]

## II.  STANDARD OF REVIEW

"We review a district court's affirmance of a bankruptcy court decision by applying the same standard of review to the bankruptcy court decision that the district court applied."  *In re Martinez*, 564 F.3d 719, 725–26 (5th Cir. 2009). "We thus generally review factual findings for clear error and conclusions of law *de novo*."  *In re OCA, Inc.*, 551 F.3d 359, 366 (5th Cir. 2008).  "A finding of fact is clearly erroneous only if on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed."  *In re Duncan*, 562 F.3d 688, 694 (5th Cir. 2009) (per curiam) (internal quotation marks and citation omitted).  "We give deference to the bankruptcy court's determinations of witness credibility."  *Id.* at 695.

## III.  DISCUSSION

### A.  Liberty Mutual's Statute of Limitations Defense

Liberty Mutual first contends that the bankruptcy court erred in concluding that Lamesa's claim against the bond was not time-barred.  Section

---

[5] We note with appreciation that, at our request, the Office of the General Counsel for the Executive Office for United States Trustees filed a supplemental letter brief in this case. We acknowledge the helpfulness of that brief, though we agree with Liberty Mutual's argument that the views of the Office for United States Trustees are not, as a matter of law, entitled to deference in this case.

No. 12-10677

322(d) of the Bankruptcy Code provides that "[a] proceeding on a trustee's bond may not be commenced after two years after the date on which such trustee was discharged." 11 U.S.C. § 322(d). Liberty Mutual does not dispute that this limitations period is relevant, nor does it argue that Lamesa's suit was not brought within two years of the Trustee's discharge.[6] Instead, it maintains that the bankruptcy court erred in failing to recognize that the limitations period for suits against a surety, as prescribed by 11 U.S.C. § 322(d), purportedly is distinct from the limitations period applicable to a claim brought directly against a trustee.

As it did in the lower courts, Liberty Mutual argues that Lamesa's suit implicates two different statutes of limitations. The first limitations period at issue is that contained in 11 U.S.C. § 322(d), which Liberty Mutual asserts merely sets a maximum expiration period for suits against a trustee's bond. Additionally, because Liberty Mutual argues that federal law does not govern the "underlying obligation of a trustee," it contends that a court also must consider the state-law limitations period associated with the underlying tort claim against a trustee. In Liberty Mutual's view, the distinction between these two limitations periods is important because a surety on a bond may assert any defense that the bond's principal would have to the claim, including the expiration of a shorter limitations period that would bar the claim were it brought directly against the principal.

Stated differently, Liberty Mutual argues that Lamesa's claim against the bond was derivative to an underlying state-law negligence claim against the Trustee directly. Liberty Mutual thus maintains that the viability of Lamesa's claim against the bond was dependent on the viability of a negligence claim against the Trustee. In Liberty Mutual's opinion, the two-year limitations

---

[6] Indeed, as all parties acknowledge, the Trustee had not even been discharged when Lamesa sued Liberty Mutual.

No. 12-10677

period set forth in 11 U.S.C. § 322(d) for suits against the bond merely establishes an outer limit for such suits, which may be shortened by a state limitations period associated with the underlying cause of action. Thus, if the underlying claim against a trustee would be time-barred, the purported derivative liability of a surety would not attach, and the surety could not be held liable under the bond even if the claim were not time-barred under 11 U.S.C. § 322(d).

Liberty Mutual relies on these arguments to support its contention that Lamesa's claim was time-barred. In so doing, it cites to section 16.003(a) of the Texas Civil Practice and Remedies Code, which provides that negligence suits must be brought within two years of the accrual date of the cause of action. Tex. Civ. Prac. & Rem. Code § 16.003; *see also Askanase v. Fatjo*, 130 F.3d 657, 668 (5th Cir. 1997).[7] Because the instant adversary proceeding commenced on November 2, 2009, Liberty Mutual asserts that section 16.003's two-year limitations period bars any claims that accrued against the Trustee before November 2, 2007. Here, Liberty Mutual suggests that any alleged misconduct by the Trustee occurred no later than 2005, meaning that section 16.003 would have barred Lamesa's claim had it been brought against the Trustee directly. Given Liberty Mutual's contention that a surety may assert any defense available to the principal, it argues that Lamesa's claim against it, as the Trustee's surety, likewise was time-barred.

---

[7] As relevant, section 16.003(a) of the Texas Civil Practice and Remedies Code provides that "a person must bring suit for trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury, forcible entry and detainer, and forcible detainer not later than two years after the day the cause of action accrues." As we explained in *Askanase*, this statute provides the limitations period for negligence actions in Texas. 130 F.3d at 668.

No. 12-10677

**(1) The Opinions of the Lower Courts**

In analyzing Liberty Mutual's arguments, the bankruptcy court accepted that section 16.003 of the Texas Civil Practice and Remedies Code "presumably applies in cases involving negligence or gross negligence" by a Chapter 7 trustee. It thus framed the question presented as "whether section 322 of the Bankruptcy Code preempts state law limitations" like those contained in section 16.003. In resolving this issue, the court stated that it was bound by *Oles Grain Co. v. Safeco Insurance Co. of America*, 221 B.R. 371, 375 (N.D. Tex. 1998). There, in addressing arguments similar to those advanced by Liberty Mutual, the district court had concluded that, in enacting 11 U.S.C. § 322(d), "Congress intended to create a statute of limitations for actions on a bankruptcy trustee's bond that was to be *the* statute of limitations for such actions." *Oles Grain*, 221 B.R. at 375. The *Oles Grain* court reached this conclusion after noting that there was "no indication that Congress intended to set merely an outer limit, within which states might give parties less time to bring actions on a trustee's bond." *Id.*

Relying on this language, the bankruptcy court in the instant action found 11 U.S.C. § 322(d) controlling. It further observed, however, that the court in *Oles Grain* also had "considered whether, under [Texas] law, a surety was exonerated when the limitations period had run on a hypothetical action directly against the principal." The bankruptcy court explained that, in construing Texas law, the *Oles Grain* court had "concluded that the Texas Supreme Court would not adopt a strict rule that exonerated a surety if limitations had run against the principal."

Notwithstanding its repeated references to Texas law, the bankruptcy court's opinion included a lengthy footnote questioning the applicability of state law in cases concerning a Chapter 7 trustee's surety bond. In particular, the court explained:

No. 12-10677

> This case concerns the liability of a bonding company under a bond issued pursuant to section 322 of the Bankruptcy Code "in favor of the United States." As a condition of serving as a case trustee in a bankruptcy case, the appointed trustee is required to obtain such a bond. The United States trustee selects the trustee and determines the amount and sufficiency of the bond. . . . And, as discussed above, the Code provides that an action on the bond may not be commenced after two years after the date on which such trustee was discharged. [11 U.S.C.] § 322(d). This is a decidedly federal case.

The bankruptcy court further noted that the *Oles Grain* court had expressed similar sentiments. There, the district court had explained that, "[i]n one instance, the Fifth Circuit found that where a bond is issued pursuant to a federal statute, federal law controls the scope of liability on a bond." *Oles Grain*, 221 B.R. at 376 n.8 (citing *Transamerica Ins. Co. v. Red Top Metal, Inc.*, 384 F.2d 752, 754 (5th Cir. 1967), *overruled on other grounds by F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 126–27 & n.12 (1974)). The *Oles Grain* court opined that, just as in *Transamerica*, "[p]erhaps federal law should also govern the extent to which a surety's liability depends [on a] trustee's liability for bonds issued pursuant to 11 U.S.C. § 322." *Id.*

Regardless of this aside, the bankruptcy court rested its decision on the conclusion that *Oles Grain* dictated that 11 U.S.C. § 322(d) was the controlling statute of limitations in this case. The court therefore held that Lamesa's action was not time-barred. On appeal, the district court affirmed, concluding that the bankruptcy court properly relied on *Oles Grain*, and that "[t]he requirement of the bond is set by federal statute and that federal statute supplies the limitations period for claims made on that bond." It thus rejected Liberty Mutual's argument that section 322(d) did not supply the dispositive limitations period in this case.

In this court, Liberty Mutual continues to argue that Lamesa's claim was time-barred under section 16.003 of the Texas Civil Practice and Remedies Code.

11

No. 12-10677

Lamesa, on the other hand, maintains that 11 U.S.C. § 322(d) is the only statute of limitations relevant to this case. Despite the force with which Liberty Mutual continues to advance its argument, we reject it, for as we explain below, it is based upon a fundamental misunderstanding of the nature of a Chapter 7 trustee's surety bond. Under 11 U.S.C. § 322(d), a proceeding on a trustee's bond must be commenced within two years of the trustee's discharge. This provision establishes the only limitations period applicable to Lamesa's claim. Because it is undisputed that Lamesa commenced its action within the time prescribed by section 322(d), we agree with the bankruptcy and district courts that Lamesa's claim was not time-barred, though we resolve the question somewhat differently than did either of the lower courts.

**(2) The General Statutory Framework Surrounding Federal Bonds**

Although we ultimately conclude that the limitations period in 11 U.S.C. § 322(d) is controlling, our rationale for doing so depends upon our first placing the provision in its larger context. Most broadly, federal law generally governs all federal bonds. *See* 31 U.S.C. §§ 9301–9309. Of particular relevance, 31 U.S.C. § 9304 provides that when a surety bond is permitted or required by federal law, the bond must be issued by a surety that satisfies certain criteria, and it must "be approved by the official of the [g]overnment required to approve or accept the bond." 31 U.S.C. § 9304(a), (b). Pursuant to 31 U.S.C. § 9307(a)(1), "[a] surety corporation providing a surety bond under section 9304 . . . may be sued in a court of the United States having jurisdiction of civil actions on surety bonds." Further, "[i]n a proceeding against a surety corporation providing a surety bond under section 9304 . . . , the corporation may not deny its power to provide a surety bond or to assume liability." *Id.* § 9307(b).

**(3) The Bond Required by 11 U.S.C. § 322**

Within the specific context of bankruptcy law, since the enactment of the Bankruptcy Act of 1898, federal law has required bankruptcy trustees to obtain

12

surety bonds issued in the name of the United States, securing the trustees' "faithful performance" of their official duties. *See* Bankruptcy Act of 1898, ch. 541, § 50(b), 30 Stat. 544, 558 (codified at 11 U.S.C. § 78) (repealed 1978); Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 322(a), 92 Stat. 2549 (codified as amended at 11 U.S.C. § 322). As already noted, this requirement currently is codified at 11 U.S.C. § 322(a), which provides that before a trustee may engage in any official duties, he or she must "file[] with the court a bond in favor of the United States conditioned on the faithful performance of such official duties." As this statutory language expressly reflects, bonds such as these—sometimes referred to as "faithful performance bonds"—are "given by federal officers to ensure their faithful performance of their federal duties." *Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 693 n.17 (1963); *see also Bedenbaugh v. Nat'l Surety Corp.*, 227 F.2d 102, 103–04 (5th Cir. 1955).

Subparts (c) and (d) of section 322 concern liability under the bond for breach of those duties. First, 11 U.S.C. § 322(c) states that "[a] trustee is not liable personally or on such trustee's bond in favor of the United States for any penalty or forfeiture incurred by the debtor." This provision thus implicitly recognizes two distinct forms of Chapter 7 trustee liability: A trustee may be liable personally, or he or she may be liable on the bond. Section 322(c) creates a limited exception to both types of liability, however, by providing that the trustee is not liable for any penalty or forfeiture incurred by the debtor. 11 U.S.C. § 322(c).

Moreover, as previously noted, section 322(d) establishes the limitations period for suits against a trustee's bond. In particular, the statute provides that "[a] proceeding on a trustee's bond may not be commenced after two years after the date on which such trustee was discharged." *Id.* § 322(d). According to the provision's legislative history, section 322(d) "fixes a two year statute of

limitations on *any* action on a trustee's bond." S. Rep. No. 95–989, at 37 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5823 (emphasis added). As other courts have observed, there is no indication in the language of section 322(d) that the statute merely sets an outer limitations period that might be shortened by state statutes of limitations. *See Oles Grain* 221 B.R. at 375; *In re Armstrong*, 245 B.R. 123, 129 (Bankr. D. Neb. 1999) (rejecting the argument that a state statute of limitations controlled in an action against a section 322(a) bond, after holding that "[t]he claim asserted by the plaintiffs is inherently a federal claim arising under federal law and therefore is subject only to the applicable federal statute of limitations").

### (4) Claims on a Trustee's 11 U.S.C. § 322 Bond

Of course, the terms of the bond itself also are integral to understanding liability issues surrounding a trustee's bond. In the bond currently at issue, Liberty Mutual and the Trustee bound themselves "jointly and severally" to the United States. Pursuant to 11 U.S.C. § 322(a), Liberty Mutual agreed to pay on the bond if the Trustee failed in the "faithful performance of [her] official duties." As previously noted, 31 U.S.C. § 9307(a)(1) generally authorizes claims to be brought against a surety of a federal bond such as this one. In addition, the Federal Rules of Bankruptcy Procedure provide greater specificity for parties like Lamesa that advance claims within a bankruptcy proceeding against a Chapter 7 trustee's surety bond. Rule 2010 states that "[t]he United States trustee may authorize a blanket bond in favor of the United States conditioned on the faithful performance of official duties by the trustee or trustees." Fed. R. Bankr. P. 2010(a). The rule further provides that "[a] proceeding on the trustee's bond may be brought by any party in interest in the name of the United States for the use of the entity injured by the breach of the condition." Fed. R. Bankr. P. 2010(b).

No. 12-10677

**(5) The Timeliness of Lamesa's Claim**

With these background principles in mind, we have no difficulty affirming the bankruptcy court's conclusion that Lamesa timely filed its claim, though we approach the question differently than did the lower courts. As the foregoing discussion makes plain, any reliance on Texas law by Liberty Mutual is unfounded. In this case, Liberty Mutual issued the Trustee's surety bond pursuant to federal law. *See* 11 U.S.C. § 322; 31 U.S.C. §§ 9301–9309. Similarly, it was federal law, not state law, that authorized suit on the bond. 31 U.S.C. § 9307(a)(1); Fed. R. Bankr. P. 2010(b). Lamesa's amended complaint expressly stated that its adversary proceeding arose under 11 U.S.C. § 322(d) and Rule 2010(b) of the Federal Rules of Bankruptcy Procedure. As previously noted, the complaint also alleged that the Trustee "did not faithfully perform [her] duties" and, consequently, that she "breached the condition of [Liberty Mutual's] blanket bond." Accordingly, the amended complaint charged that Liberty Mutual was obligated *on the bond* for the damages caused by the Trustee's breach. Thus, as the bankruptcy court stated, "[t]his is a decidedly federal case."

Indeed, given the robust statutory framework surrounding federal bonds, courts have long recognized that, as a general matter, federal law governs disputes concerning federal bonds. In *Transamerica*, for example, we considered whether a surety providing a bond under the Miller Act was liable for attorneys' fees. 384 F.2d at 753. Because the Act was silent on the issue, the surety had argued that state law controlled of its own force. *Id.* at 754. We rejected that argument, however, concluding that the question was controlled by federal law. *Id.* In reaching that conclusion, we explained that the rights protected by the Miller Act bond did "not originate in the common law or in Texas statutes." *Id.* Instead, those rights derived "from a congressional statute providing for a

15

payment bond giving protection to all persons supplying labor and materials on a government contract." *Id.* (internal quotations marks omitted). Like the claim at issue here, we explained that a Miller Act claim "is a federally created cause of action; it must be brought in the name of the United States; and Congress has vested federal courts with exclusive jurisdiction over all suits to enforce the action." *Id.* We thus held that we merely were tasked with "construing a federal statute and the bond issued in compliance with the statute." *Id.*

Admittedly, as Liberty Mutual argues, in *Transamerica* we ultimately did rely on state law to determine the surety's liability for attorneys' fees. *Id.* We did so, however, only after noting that such action was necessary "to fill the hiatus in the statute." *Id.* at 756. We further emphasized "that state law 'govern[ed]' only through incorporation into federal law, not through its own force." *Id.* at 755. In any event, seven years later, the *F.D. Rich* Court rejected this aspect of our approach. 417 U.S. at 127. There, the Supreme Court noted that, similarly to our approach in *Transamerica*, the Ninth Circuit had "construed the [Miller] Act to require an award of attorneys' fees where the 'public policy' of the State in which suit was brought allows for the award of fees in similar contexts." *Id.* at 126. The Supreme Court held this construction to be erroneous. *Id.* at 127. In so doing, the Court stated:

> The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law. Neither respondent nor the court below offers any evidence of congressional intent to incorporate state law to govern such an important element of Miller Act litigation as liability for attorneys' fees.

*Id.*

*Transamerica* and *F.D. Rich* thus stand for the proposition that, at least as to bonds issued pursuant to the Miller Act, federal law determines the scope of liability on a federal bond. Other courts have extended this principle to

No. 12-10677

different federal bonds. In *International Association of Machinists*, for instance, the Supreme Court, in discussing its earlier holding in *American Surety Co. of New York v. Schultz*, 237 U.S. 159 (1915), explained that the *American Surety* Court had held that "the construction of [a federal supersedeas] bond and the extent of the surety company's liability under it were said to be federal questions." 372 U.S. at 692–93; *see also Bock v. Perkins*, 139 U.S. 628, 630 (1891) (action against federal marshal, who was required by federal law to obtain a surety bond "for the faithful performance of the duties of his office," was one "arising under the laws of the United States"); *Feibelman v. Packard*, 109 U.S. 421, 424 (1883) (suit against federal marshal for alleged breach of a condition of marshal's federally-mandated bond "was plainly upon the bond itself and therefore arose directly under the provisions of an act of congress").

To be sure, as Liberty Mutual points out, some of these cases have focused primarily on jurisdictional issues surrounding the questions that were presented. We underscore, however, that as with the bond required under the Miller Act, the rights and obligations associated with a Chapter 7 trustee's surety bond do not originate in state statutes, but rather derive from federal law and the bond issued in compliance therewith. *See Transamerica*, 384 F.2d at 754; 11 U.S.C. § 322(a). As noted throughout this opinion, 11 U.S.C. § 322(a) expressly states that the bond is "conditioned on the faithful performance of [a trustee's] official duties." Those duties—including, as is particularly relevant here, the obligation to liquidate the estate's assets and expeditiously pay its creditors—are prescribed by federal law. *See* 11 U.S.C. § 704. Where these duties have not been codified, the Supreme Court has defined them, as well as the associated liability for breaches thereof, by resorting to federal common law rather than state law. *See Mosser v. Darrow*, 341 U.S. 267, 271–72 (1951) (applying federal common law to determine a trustee's liability for breach of duty of loyalty); *United States ex rel. Willoughby v. Howard*, 302 U.S. 445, 450 (1938)

17

(defining a bankruptcy trustee's official duties as the fiduciary of an estate by relying on federal common law).  We too have applied federal common law principles to define the scope of a bankruptcy trustee's duties and liabilities.  *See In re Smyth*, 207 F.3d 758, 761–62 (5th Cir. 2000) (examining federal common law to determine standard of care required of bankruptcy trustees); *accord In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 6–7 (1st Cir. 1999).

Given this comprehensive federal scheme governing the surety bonds of bankruptcy trustees, we thus are of the view that our role is limited to construing federal law and the terms of the bond issued in connection therewith. Here, federal law makes plain the limitations period for claims against the bond.[8]  *See* 11 U.S.C. § 322(d).  There thus is no need to rely on Texas law, as Liberty Mutual asks us to do.  Indeed, were we to apply section 16.003 of the Texas Civil Practice and Remedies Code as Liberty Mutual urges, we would frustrate the purposes and objectives of Congress in enacting 11 U.S.C. § 322(d). For the same reasons, we reject Liberty Mutual's reliance on general principles of surety law, the adoption of which—at least as framed by Liberty Mutual—would require us to ignore the existing framework surrounding the bonds of Chapter 7 trustees.[9]

---

[8] As our discussion makes clear, we reject Liberty Mutual's view that Congress has enacted only "limited provisions relating to bonds."  Moreover, as we have highlighted, Congress's statutory scheme has been amplified by the pronouncements of federal courts—most especially, of course, the Supreme Court—that have interpreted those bonds. Thus, Liberty Mutual's reliance on *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994) is unavailing.  There, "in a suit by the Federal Deposit Insurance Corporation as receiver of a federally insured bank," the Supreme Court held that state law, rather than federal law, provided the "rule of decision governing tort liability of attorneys who provided services to the bank."  *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. at 80–81, 89.  In relying on *O'Melveny & Myers*, however, Liberty Mutual neglects that, in contrast to this case, the cause of action there arose under state common law—a fact the Court stressed as central to its holding.  *Id.* at 83–84.  The Court also made clear that if, as here, "an explicit federal statutory provision" existed, "we of course would not contradict" it.  *Id.* at 85.

[9] In any event, although Liberty Mutual repeatedly suggests that the surety may assert any defense that the principal may have asserted, we note as an aside that a leading

No. 12-10677

Furthermore, the terms of the bond itself render unavailing Liberty Mutual's argument that its liability under the bond depends on the viability of a claim against the Trustee. Liberty Mutual's bond makes it "jointly and severally" liable with the Trustee for her failure to faithfully perform her duties. This means that each party may be sued independently, or, in other words, that Liberty Mutual's liability under the bond is direct rather than derivative. *See Minor v. Mechanics' Bank of Alexandria*, 26 U.S. 46, 73 (1828) (under a joint and several faithful performance bond, "the plaintiff might have commen[ced] suit against each of the obligors, severally, or a joint suit against them all"); *Downer v. U.S. Fid. & Guar. Co. of Md.*, 46 F.2d 733, 734 (3d Cir. 1931) (holding that the surety of a joint and several bond has *direct liability* and may be sued individually or collectively). Nothing in the bond conditions Liberty Mutual's liability upon the viability of a claim against the Trustee. Accordingly, the bond itself permitted Lamesa to file claims directly against Liberty Mutual at any time within the period set forth in 11 U.S.C. § 322(d).

Finally, even were this not so, Liberty Mutual's argument that it merely was derivatively liable and, by extension, that the claim was time-barred, neglects that just as it was jointly and severally liable under the bond, so too was the Trustee. Thus, the Trustee could have been sued on the bond for a breach of the bond's conditions at any time before the expiration of the limitations period prescribed by 11 U.S.C. § 322(d). In other words, even assuming Liberty Mutual were subject to derivative liability only (which we have rejected), a suit directly against the Trustee on the bond would still have been viable under section 322(d) when Lamesa filed its claim against Liberty Mutual.

---

commentator suggests that "the weight of authority maintains that the surety may not plead the running of the statute of limitations against the principal obligor." 23 Williston on Contracts § 61:7 (4th ed. 2013).

No. 12-10677

This conclusion is supported first by section 322's text. As we have noted, section 322(c) establishes that a trustee may be held "liable personally or *on such trustee's bond*," though the statute exempts the trustee from liability "for any penalty or forfeiture incurred by the debtor." 11 U.S.C. § 322(c) (emphasis added). The construction of this statute makes plain that a trustee may be sued personally or on the bond. Similarly, section 322(d), which prescribes the limitations period for suits against the bond, refers to "[a] proceeding on a trustee's bond." *Id.* § 322(d). This provision therefore is not limited in its application only to proceedings against the surety, but rather also contemplates suits on the bond against the trustee. *Id.*; *see also* Fed. R. Bankr. P. 2010(b) ("A proceeding *on the trustee's bond* may be brought by any party in interest in the name of the United States for the use of the entity injured by the breach of the condition." (emphasis added)).

Our conclusion that the Trustee could have been sued directly on the bond until expiration of the limitations period in section 322(d) also is consistent with Supreme Court precedent. In *Willoughby*, for example, the Court considered a claim brought against a surety and a former bankruptcy trustee. 302 U.S. at 446–48. As here, the case involved liability under a faithful performance bond, issued under the predecessor statute to section 322. *Id.* at 447. In discussing the facts, the Court made clear that both the surety and the former trustee had been sued directly on the bond. *See id.* at 447–48 (noting that three actions were brought "in the name of the United States against [the former trustee] and the casualty company"); *id.* at 448 ("[R]ecovery was sought on each bond on the ground that its condition had been broken by [the former trustee's] failing to perform his official duties as trustee or receiver."); Br. of Pet'rs at 5, *Willoughby*, 1937 WL 40857 (No. 30) (explaining that suit was brought against the former trustee "upon his official bonds" and against the casualty company "as surety upon . . . said official bonds"). After generally discussing a trustee's duties, as

20

well as the particular breach that had been alleged, the *Willoughby* Court explained that if the trustee, in fact, had failed in performing his official duties, both "he and his surety are liable *on the bonds*." *Id.* at 454 (emphasis added). Ultimately, the Court remanded the case for reconsideration in light of its opinion. *Id.*; *see also United States ex rel. Wilhelm v. Chain*, 300 U.S. 31, 32–33 (1937) (concerning action "on the bond" against bank, which had been designated as an authorized depository for funds of bankruptcy estates, and the bank's sureties, all of which were jointly and severally liable on the bank's faithful performance bond).

These cases, along with the text of section 322, make clear that trustees may be held directly liable on the bond. The statute of limitations for such suits is supplied by section 322(d). Thus, even were we to assume that Liberty Mutual's liability merely was derivative to the Trustee's liability, because Lamesa's claim would have been timely filed against the Trustee, it likewise was timely filed against Liberty Mutual.

In sum, we hold for these myriad reasons that the controlling limitations period in this case is provided by 11 U.S.C. § 322(d). Liberty Mutual does not contest that Lamesa's claim was timely under that provision. Accordingly, we affirm the bankruptcy court's conclusion that Lamesa's suit was not time-barred.

## B. The Trustee's Gross Negligence

Turning to the merits, Liberty Mutual contends that the bankruptcy court clearly erred in concluding that the Trustee was grossly negligent. In effect, Liberty Mutual maintains that a trustee in circumstances similar to those faced by the Trustee would not have foreseen that Mrs. Schooler might misappropriate the assets of the probate estate over which she served as executrix. It suggests that the Trustee simply made "a judgment call," based on her experience in similar matters, regarding administration of the Gremminger probate estate.

No. 12-10677

Relatedly, Liberty Mutual argues that the bankruptcy court erred in making a finding as to the Trustee's gross negligence without first having heard expert testimony regarding whether the Trustee's conduct had deviated from the standard of care. According to Liberty Mutual, expert testimony was required because the proper conduct of a bankruptcy trustee in a given situation is a matter of professional judgment. We address each of these contentions in turn.

**(1) The Standard of Care Required of Bankruptcy Trustees**

In our review of a bench trial, a lower "court's rulings on negligence, cause, and proximate cause are findings of fact, while its determination of the existence of a legal duty is a question of law." *Theriot v. United States*, 245 F.3d 388, 394–95 (5th Cir. 1998) (per curiam) (internal quotation marks and citation omitted). As the bankruptcy court explained, a bankruptcy trustee is obligated to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). Although the Bankruptcy Code is silent as to the standard of care to which trustees are to be held in fulfilling these and similar duties, we previously have held that bankruptcy trustees are liable only for gross negligence. *Smyth*, 207 F.3d at 762.[10] Gross

---

[10] In *Smyth*, we discussed the morass surrounding the standard of care required of bankruptcy trustees. 207 F.3d at 761–62. In particular, we noted that although the Supreme Court had held in *Mosser* that trustees could be held personally liable for "willfully and deliberately" breaching their fiduciary duties, the case "did not address a trustee's personal liability with regard to negligent actions." *Id.* at 761 (citing *Mosser*, 341 U.S. at 272–73). We further explained that, following *Mosser*, a circuit split had emerged whereby some courts had concluded that a bankruptcy trustee could not be held personally liable unless he acted willfully and deliberately, whereas others had concluded that a trustee could be held liable for mere negligence. *Id.* After considering this authority and related policy considerations—particularly that "too little protection might expose a trustee to excessive personal liability and dissuade capable people from becoming trustees, while too much protection would jeopardize the goal of responsible estate management"—we determined that bankruptcy trustees should be held to a gross negligence standard. *Id.* at 761–62.

Relying on *Smyth*, both courts below analyzed the Trustee's conduct against a gross negligence standard, and neither party has challenged that approach in this court. However, the Office for United States Trustees ("the government") takes issue with our conclusion in

22

negligence "is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected." *Id.* (internal quotation marks and citation omitted).

### (2) Evidence of the Trustee's Gross Negligence

As previously noted, Liberty Mutual argues that the Trustee was justified in relying on Mrs. Schooler voluntarily to turn over the assets from the Gremminger estate. It maintains that, because it was not foreseeable to the Trustee that Mrs. Schooler would dissipate the inherited assets, the Trustee's conduct cannot be said to have been grossly negligent. It also suggests that, by the time the Trustee reasonably should have been concerned about Mrs.

---

*Smyth*, asserting that the opinion overlooked contrary, binding authority, and that a "gross negligence standard is not easily reconciled with the Supreme Court decisions holding that trustees, generally, and bankruptcy trustees, specifically, may be sued for simple negligence." In support of this statement, the government points, *inter alia*, to *Willoughby*, which involved a suit against a bankruptcy trustee's faithful performance bond and an allegation that the trustee had been "negligent in the performance of his official duties." 302 U.S. at 448. In analyzing the issue, the *Willoughby* Court explained that "[a]s the exercise of ordinary care in making and maintaining deposits [for the estate] . . . was part of [the trustee's] duties, he and his surety are liable on the bonds if he failed in this respect." *Id.* at 454; *see also id.* at 450 ("By the common law, every trustee or receiver of an estate has the duty of exercising reasonable care in the custody of the fiduciary estate . . . ." (footnote omitted)); *Howard v. United States ex rel. Stewart*, 184 U.S. 676, 693 (1902) (suit may be brought on a faithful performance bond for the "negligence and malconduct" of the covered officers (internal quotations marks and citation omitted)); *United States v. Thomas*, 82 U.S. 337, 342–43 (1872) (explaining, in case involving an official bond, that trustees are "bound to exercise the same care and solicitude with regard to the trust property which they would exercise with regard to their own"). According to the government, these cases support the proposition that a bankruptcy trustee may be sued for mere negligence.

As we did in *Smyth*, we again acknowledge the tension in this area of the law, and we note that the government has advanced a persuasive argument challenging our holding in *Smyth*. Nevertheless, because it is well-settled that absent an intervening change in the law, one panel of this court may not unilaterally overrule or disregard another panel's decision, we recognize that we are bound by *Smyth*. *See In re Pilgrim's Pride Corp.*, 690 F.3d 650, 663 (5th Cir. 2012). This presents no difficulty here, however, since we agree with the bankruptcy and district courts that the evidence satisfies even the gross negligence standard adopted in *Smyth*.

No. 12-10677

Schooler's conduct, the assets already were gone, meaning that the Trustee's inaction was not the cause of the bankruptcy estate's harm. As the bankruptcy court concluded, however, these contentions of Liberty Mutual are belied by the record.

Contrary to Liberty Mutual's arguments, and as the bankruptcy court found, the Trustee had ample evidence indicating that it was necessary for her to more aggressively seek control over the assets in the Gremminger estate. First, the Schoolers' bankruptcy proceeding initially began as a no-asset case, so Gremminger's death signaled the possibility of an unanticipated significant increase in the funds creditors potentially could recover from the Schoolers. Second, the Trustee received numerous letters from Lamesa's counsel in which Lamesa expressed genuine and justified concern that the Schoolers did not intend voluntarily to turn over Mrs. Schooler's inherited assets, and in which Lamesa urged the Trustee to intervene in the Gremminger probate proceeding.[11] Third, despite the Schoolers' intransigence in providing to the Trustee and the bankruptcy estate an accounting of assets Mrs. Schooler received from the Gremminger estate, Mrs. Schooler moved almost immediately to probate her deceased father's will. Fourth, after this was discovered and inquired into, the Schoolers refused to acknowledge an obligation to turn over assets to the bankruptcy estate, and instead advanced various novel legal theories to justify their failure to do so. Finally, as early as December 2001, the Trustee herself expressed in letters to the Schoolers' attorneys that she was concerned that Mrs. Schooler was not the best person to administer the Gremminger estate,

---

[11] Liberty Mutual suggests that the desires of a creditor do not necessarily reflect the proper course of action a trustee should pursue. Although true, Lamesa's repeated inquiries and expressions of concern undermine Liberty Mutual's contention that Mrs. Schooler's dissipation of the Gremminger assets was unforeseeable to the Trustee.

24

presumably owing to the ease with which Mrs. Schooler could access the estate's assets.

Notwithstanding these many warning signs, the Trustee took no action in the probate proceeding to have an alternate executor appointed, and she inordinately delayed pursuing any action in the bankruptcy court to recover assets from the Gremminger estate to which the bankruptcy estate legally was entitled.  Moreover, the Trustee neglected to provide a written response to any of Lamesa's inquiries, and she made no formal demand, prior to 2005, that the Schoolers turn over the assets they received from the Gremminger estate.  All the while, the Trustee filed in the Schoolers' bankruptcy proceeding reports inaccurately reflecting that she had assumed at least constructive possession of assets from the Gremminger estate.

Although Liberty Mutual asserts that it was reasonable in these circumstances for the Trustee to rely on the Schoolers voluntarily to turn over the inherited assets, "it should come as no surprise to an experienced bankruptcy trustee[] that some debtors are undependable or dishonest or both." *In re Rollins*, 175 B.R. 69, 74 (Bankr. E.D. Cal. 1994).  When the Schoolers did not promptly acknowledge and fulfill their obligation to turn over the assets to the bankruptcy estate, the Trustee should have pursued other options for seizing the inheritance.  *See id.*  Under the circumstances presented here, the Trustee's failure to do so demonstrated an indifference on her part to fulfilling her duties to "collect and reduce to money the property of the estate for which [she] serve[d], and close such estate as expeditiously as [was] compatible with the best interests of parties in interest."  11 U.S.C. § 704(a)(1).

Furthermore, the consequences of the Trustee's failure to recover the assets from the Gremminger estate were clear: The inherited assets easily were liquidated, as evidenced by Mrs. Schooler's eventual dissipation of the related funds.  As a result of the Trustee's failure to act in the face of this risk, the

bankruptcy estate lost a substantial portion of its assets. Thus, the Trustee's conduct amounts to aggravated neglect of her legal duties and obligations, and indifference to the effect of her actions on the estate's creditors. *See Smyth*, 207 F.3d at 762. Accordingly, we conclude that the bankruptcy court's finding that the Trustee was grossly negligent in performing her duties was not clearly erroneous.

### (3) Expert Testimony

On a related point, Liberty Mutual submits that the absence of any expert testimony as to the standard of care and, by extension, the propriety of the Trustee's decision not to act in connection with Mrs. Schooler's administration of the Gremminger estate precluded entry of judgment against it as the Trustee's surety. Pursuant to Federal Rule of Bankruptcy Procedure 9017, the Federal Rules of Evidence apply to cases brought under the Bankruptcy Code. The Federal Rules of Evidence do not explicitly provide a standard for determining when expert testimony is required to establish whether a trustee's conduct deviated from the standard of care. However, under Federal Rule of Evidence 702, expert testimony may be introduced only when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." Fed. R. Evid. 702 advisory committee's note. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Id.* (internal quotation marks and citation omitted).

Finders of fact "are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence

consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn." *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 419 (5th Cir. 2012) (internal quotation marks and citation omitted). Accordingly, we have explained that, as a general rule, "[e]xpert testimony is not needed in many if not most cases." *Id.* Moreover, although expert testimony may be "necessary in a professional negligence case to establish the standard of care for the industry," an exception applies in "instances of negligence that are a matter of common knowledge comprehensible to laymen." *In re Fabbro*, 411 B.R. 407, 425 n.54 (Bankr. D. Utah 2009); *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (expert testimony unnecessary where trier of fact is "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation" (internal quotation marks and citation omitted)); *Huffman*, 675 F.3d at 419 (expert testimony only required "when conclusions as to the evidence cannot be reached based on the everyday experiences" of the fact finder).

Although Liberty Mutual contends that expert testimony was required in this case, Lamesa suggests that inasmuch as the Trustee failed to act in the face of obvious danger posed by Mrs. Schooler's ready access to the bankruptcy estate's assets, and in the face of repeated warnings and inquiries by a concerned creditor, a layperson could discern that the standard of care was not met in this case.

We agree with Lamesa that, under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken *some* form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court

explained, by doing nothing, the Trustee ignored basic human nature: Common knowledge would suggest that the Schoolers, having filed for bankruptcy because of financial difficulties, would be tempted to dissipate the assets Mrs. Schooler inherited from the Gremminger estate, especially when no demand was made of them by the Trustee to turn over the assets. The obviousness of the Trustee's gross neglect in this case is underscored by Lamesa's repeated and urgent requests that the Trustee act; the Schoolers' indications that they intended to use assets from the Gremminger estate, and possibly intended to disclaim the inheritance; the Trustee's own admission that she was concerned about Mrs. Schooler serving as executrix; and the Trustee's inaccurate reporting that she already had obtained possession of the assets from the Gremminger estate. In the face of this and other related evidence, expert testimony was not necessary to establish that the Trustee failed to meet her standard of care.[12]

## C. Damages

Lastly, Liberty Mutual argues that the bankruptcy court clearly erred in awarding damages of $112,247.66 to the bankruptcy estate. It contends that the Trustee's testimony established that, even absent the Schoolers' misappropriation of the inherited assets, only a net of approximately $85,000 could have been recovered by the bankruptcy estate. Given the Trustee's testimony that the legal costs of obtaining those funds from the Schoolers would have totaled between $20,000 and $25,000, Liberty Mutual suggests that the court's judgment should be reduced to $60,000, or remanded.

---

[12] Liberty Mutual also briefly suggests that expert testimony was needed to establish that the Trustee's conduct *caused* the alleged damages. For the same reasons that expert testimony was not needed in this case to establish whether the Trustee's conduct deviated from the standard of care, such testimony was not required to establish that the Trustee's misconduct caused the bankruptcy estate's damages. *See Salem*, 370 U.S. at 35.

No. 12-10677

In advancing this argument, Liberty Mutual overlooks that the bankruptcy court simply rejected the Trustee's estimation of the amount that could have been recovered from the Gremminger estate absent her gross negligence. As the Federal Rules of Bankruptcy Procedure counsel, we afford great deference to the bankruptcy court's assessments of witness credibility. Fed. R. Bankr. P. 8013; *see also Matter of Webb*, 954 F.2d 1102, 1106 (5th Cir. 1992). Additionally, we note that the record supports the bankruptcy court's conclusion that damages to the estate totaled at least $112,247.66. In particular, the Trustee's own reports filed in the Schoolers' bankruptcy proceeding indicate that Mrs. Schooler received $45,288.21 from the sale of her deceased father's house and $67,959.45 in cash and other assets, for a total of $113,247.66. Because the Trustee's gross negligence caused damages of at least $112,247.66, Liberty Mutual has not demonstrated that the court's damage award was clearly erroneous.[13]

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court, affirming the bankruptcy court, is AFFIRMED.

---

[13] Liberty Mutual also argues that the bankruptcy court's damages calculation was clearly erroneous inasmuch as it failed to credit Liberty Mutual for $12,000 recovered by the bankruptcy estate under the settlement agreement eventually reached with Mrs. Schooler. We reject this argument because Liberty Mutual's motion for credit against the judgment was abated by the bankruptcy court and, as of the time of this appeal, still awaits resolution. Accordingly, the issue is not properly before us.